Gabriel M. Ramsey
gramsey@crowell.com
Amanda Z. Saber
asaber@crowell.com
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
Telephone: (415) 986-2800

Jennie Wang VonCannon
jvoncannon@crowell.com
CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, CA 90071
Telephone: (213) 622-4750

Garylene Javier *(admitted pro hac vice)*
gjavier@crowell.com
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
Telephone: (202) 624-2500

Attorneys for Plaintiff CHEGG, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHEGG, INC., | Case No. 5:22-cv-07326-CRB |
| Plaintiff, | **PLAINTIFF CHEGG, INC.'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | [Proposed] Hearing Date: June 23, 2023 |
| JOHN DOE, | Time: 10:00 a.m. |
| Defendant. | Judge: Charles R. Breyer |
| | Courtroom: 6, 17th Floor |

# TABLE OF CONTENTS

**PAGE**

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................................1

I.     INTRODUCTION .........................................................................................................................1

II.    STATEMENT OF FACTS ...........................................................................................................2

      A.    Chegg Has Developed a Reputation as a Trusted Online Learning Platform and Limits Access to Proprietary Chegg Content to Paying Subscribers .......................2

      B.    Defendant's Operation of Homeworkify Violates Laws and Exceeds Authorized Chegg Usage ..................................................................................................................3

      C.    Defendant Is a Sophisticated Technical Actor Capable of Circumventing Chegg's Access Controls..............................................................................................................4

      D.    Defendant Has Unlawfully Capitalized on Chegg's Trademarks, Brand, Goodwill, and Reputation ..............................................................................................................5

      E.    Chegg Has Gone to Great Lengths to Unmask Defendant .......................................6

      F.    Defendant Has Caused Irreparable Harm to Chegg ..................................................7

III.   ARGUMENT .................................................................................................................................7

      A.    Chegg Satisfies All Four Elements for a Preliminary Injunction ............................7

            1.    Chegg Is Likely to Succeed on the Merits ...................................................8

                 a.    Defendant Violated the Computer Fraud and Abuse Act .................8

                 b.    Defendant Violated Section 502 ....................................................10

                 c.    Defendant Violated the Lanham Act................................................10

                 d.    Defendant Breached and Continues to Breach the Chegg Policies. 13

            2.    Defendant's Conduct Causes Irreparable Harm to Chegg ..........................14

            3.    The Public Interest Favors an Injunction ...................................................16

             4.    The Balance of Hardships Tips Sharply in Chegg's Favor .........................17

      B.    The All Writs Act Authorizes the Court to Direct Third Parties to Perform the Necessary Acts to Avoid Frustration of the Requested Relief...............................18

            1.    Chegg Meets the Threshold Requirements for AWA Relief ......................19

             2.    An AWA Order is Warranted for the Third-Party Domain Registry and Registrars ...................................................................................................20

      C.    A Preliminary Injunction Is the Only Effective Means of Relief and Alternative Service Is Warranted Under the Circumstances...................................................21

IV.   CONCLUSION...........................................................................................................................23

CROWELL
& MORING LLP
ATTORNEYS AT LAW

CHEGG MOTION FOR PRELIMINARY INJUNCTION;
CASE NO. 5:22-CV-07326-CRB

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alaska ex rel. Yukon Flats Sch. Dist. v. Native Vill. of Venetie*,
  856 F.2d 1384 (9th Cir. 1988)............................................................................................. 7, 8

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011)................................................................................................ 8

*AllscriptsMisys, LLC v. Am. Dig. Networks, LLC*,
  2010 U.S. Dist. LEXIS 4450 (D. Md. Jan. 20, 2010) ......................................................... 21

*Amazon.com, Inc. v. Sirowl Tech.*,
  2022 WL 19000499 (W.D. Wash. Oct. 3, 2022) ................................................................. 18

*In re Apple, Inc.*,
  149 F. Supp. 3d 341 (E.D.N.Y. 2016) ................................................................................. 19

*In re Application of United States for an Order Authorizing An In-Progress Trace of Wire*,
  616 F.2d 1122 (9th Cir. 1980)............................................................................................. 21

*Arista Records, LLC v. Tkach*,
  122 F. Supp. 3d 32 (S.D.N.Y. 2015) ................................................................................... 19

*Benson v. State Bd. of Parole and Prob.*,
  384 F.2d 238 (9th Cir. 1967)............................................................................................... 19

*Brookfield Commc'ns, Inc. v. West Coast Entm't*,
  174 F.3d 1036 (9th Cir. 1999)....................................................................................... 11, 16

*Calif. v. M&P Invs.*,
  46 F. App'x 876 (9th Cir. 2002) ......................................................................................... 19

*Century 21 Real Est. Corp. v. Sandlin*,
  846 F.2d 1175 (9th Cir. 1988)............................................................................................. 13

*Cisco Sys., Inc. v. Shenzhen Usource Tech. Co.*,
  2020 WL 5199434 (N.D. Cal. Aug. 17, 2020) .................................................................... 16

*Dell Inc. v. BelgiumDomains, LLC*,
  2007 WL 6862341 (S.D. Fla. Nov. 21, 2007)..................................................................... 21

*Dish Network L.L.C. v. Tan Nguyen*,
  2012 WL 12896519 (C.D. Cal. Mar. 12, 2012) .................................................................. 16

CROWELL
& MORING LLP
ATTORNEYS AT LAW

*Elsevier, Inc. v. Siew Yee Chew*,
    287 F. Supp. 3d 374 (S.D.N.Y. 2018) ..................................................................... 21

*F.T.C. v. Pricewert LLC*,
    2009 WL 1689598 (N.D. Cal. Jun. 15, 2009) ......................................................... 16

*In re Facebook Biometric Info. Privacy Litig.*,
    185 F. Supp. 3d 1155 (N.D. Cal. 2016) .................................................................. 13

*Facebook, Inc. v. Fisher*,
    2009 WL 5095269 (N.D. Cal. Dec. 21, 2009) ........................................................... 9

*Facebook, Inc. v. Grunin*,
    77 F. Supp. 3d 965 (N.D. Cal. 2015) ...................................................................... 10

*Facebook, Inc. v. ILikeAd Media Int'l Co. Ltd.*,
    2022 WL 2289064 (N.D. Cal. Feb. 1, 2022), *report and recommendation
    adopted as modified*, 2022 WL 2289058 (N.D. Cal. Mar. 15, 2022) ....................... 13, 15, 18

*Facebook, Inc. v. Power Ventures, Inc.*,
    844 F. Supp. 2d 1025 (N.D. Cal. 2012), *aff'd in part, vacated in part, rev'd in
    part*, 828 F.3d 1068 (9th Cir. 2016), *and aff'd in part, vacated in part, rev'd in
    part*, 844 F.3d 1058 (9th Cir. 2016) .................................................................. 10, 16

*Facebook, Inc. v. Sluchevsky*,
    2020 WL 5823277 (N.D. Cal. Aug. 28, 2020) ........................................................ 10, 15, 16

*Federal Marine Terminals, Inc. v. Burnside Shipping Co.*,
    394 U.S. 404 (1969) ............................................................................................. 17

*GoTo.Com, Inc. v. Walt Disney Co.*,
    202 F.3d 1199 (9th Cir. 2000) ............................................................................ 11, 14

*Hotmail Corp. v. Van$ Money Pie Inc.*,
    1998 WL 388389 (N.D. Cal. Apr. 16, 1998) .......................................................... 13

*Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*,
    150 F.3d 1042 (9th Cir. 1998) ............................................................................. 12

*LVRC Holdings LLC v. Brekka*,
    581 F.3d 1127 (9th Cir. 2009) ............................................................................... 8

*Maxim Integrated Prod., Inc. v. Quintana*,
    654 F. Supp. 2d 1024 (N.D. Cal. 2009) ............................................................... 14, 15

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
    339 U.S. 306 (1950) ............................................................................................. 21

*Multiven, Inc. v. Cisco Sys., Inc.*,
    725 F. Supp. 2d 887 (N.D. Cal. 2010) ................................................................... 8, 10

CROWELL
& MORING LLP
ATTORNEYS AT LAW

iii

CHEGG MOTION FOR PRELIMINARY INJUNCTION;
CASE NO. 5:22-CV-07326-CRB

*Nat'l Equip. Rental, Ltd. v. Szukhent*,
   375 U.S. 311 (1964) ...................................................................................... 22

*NovelPoster v. Javitch Canfield Grp.*,
   140 F. Supp. 3d 954 (N.D. Cal. 2014) ....................................................... 8, 9

*Phillips v. Ex'r of Est. of Arnold*,
   2013 WL 4458790 (W.D. Wash. Aug. 16, 2013) ........................................... 9

*Plum Creek Lumber Co. v. Hutton*,
   608 F.2d 1283 (9th Cir. 1979) .................................................................... 19

*Prudential Ins. Co. of Am. v. Infinity Funding Corp.*,
   No. 2011 WL 13228042 (C.D. Cal. May 31, 2011)..................................... 13

*Pyro Spectaculars North, Inc. v. Souza*,
   861 F. Supp. 2d 1079 (E.D. Cal. 2012) ...................................................... 16

*Rent-A-Center, Inc. v. Canyon Tele. & Appliance Rental, Inc.*,
   944 F.2d 597 (9th Cir. 1991) ...................................................................... 14

*Rio Properties, Inc. v. Rio Int'l Interlink*,
   284 F.3d 1007 (9th Cir. 2002) ............................................................... 21, 22

*Saleh v. Titan Corp.*,
   353 F. Supp. 2d 1087 (S.D. Cal. 2004) ...................................................... 19

*Sprint Sols. Inc. v. Pac. Cellupage Inc.*,
   2014 WL 3715122 (C.D. Cal. July 21, 2014) ............................................... 9

*Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.*,
   240 F.3d 832 (9th Cir. 2001) ...................................................................... 14

*U.S. S.E.C. v. Shehyn*,
   2008 WL 6150322 (S.D.N.Y. Nov. 26, 2008) ............................................ 22

*United States v. Hall*,
   583 F. Supp. 717 (E.D. Va. 1984) .............................................................. 20

*United States v. New York Tel. Co.*,
   434 U.S. 159 (1977) .................................................................................... 19

*United States v. Nosal*,
   676 F.3d 854 (9th Cir. 2012) .................................................................... 8, 9

*United States v. Professional Air Traffic Controllers Org.*,
   653 F.2d 1134 (7th Cir. 1981) .................................................................... 17

*Van Buren v. United States*,
   --- U.S. ---, 141 S. Ct. 1648 (Jun. 3, 2021) ............................................... 8, 9

*Volkswagen AG v. Verdier Microbus & Camper, Inc.*,
    2009 WL 928130 (N.D. Cal. Apr. 3, 2009) ...................................................... 14, 15

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ........................................................................................ 17

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................................ 7

**Statutes**

15 U.S.C. § 1114(1)(a) ........................................................................................ 11

15 U.S.C. §§ 1114 *et seq.* ..................................................................................... 8

15 U.S.C. § 1125(a) ............................................................................................ 11

18 U.S.C. § 1030(a)(2)(C) .................................................................................... 8

18 U.S.C. § 1030(a)(5)(A) .................................................................................... 8

18 U.S.C. § 1030(g) ............................................................................................ 17

28 U.S.C. § 331 .................................................................................................. 19

28 U.S.C. § 1651(a) ............................................................................................ 18

**Other Authorities**

Federal Rule of Civil Procedure 4(e)(2)(A) .......................................................... 22

Federal Rule of Civil Procedure 4(f)(3) ........................................................ 21, 23, 23

Federal Rule of Civil Procedure 65 ..................................................................... 1

Local Rule 7-2 and 65-2 ...................................................................................... 1

1   PLEASE TAKE NOTICE that the following motion will be heard at 10:00 A.M. on June

2   23, 2023, or as soon thereafter as counsel may be heard, in Courtroom 6, 17th Floor, 450 Golden

3   Gate Avenue, San Francisco, California before the Honorable Charles R. Breyer, Plaintiff Chegg,

4   Inc. will and hereby does move for a preliminary injunction under Federal Rule of Civil Procedure

5   65 and Local Rule 7-2 and 65-2. This motion is based on this Notice of Motion and Motion, the

6   following Memorandum of Points and Authorities, the Declaration of John Heasman, the

7   Declaration of Amanda Z. Saber, documents incorporated by reference, the entire record in this

8   action, any matters of which the Court may take judicial notice, and any evidence or argument

9   presented at the hearing or on reply.

10   **MEMORANDUM OF POINTS AND AUTHORITIES**

11   **I.   INTRODUCTION**

12   After months of working tirelessly to combat John Doe's ("Defendant's") sophisticated

13   illegal conduct to no avail, Plaintiff Chegg, Inc. ("Chegg"), now seeks the Court's intervention in

14   issuing a preliminary injunction. By masquerading as a legitimate subscriber, Defendant

15   systematically and on an unprecedented scale stole millions of pieces of proprietary content

16   developed by Chegg (the "Chegg Content") by exceeded Defendant's access to the Chegg server

17   that housed the content (separate and apart from any Chegg system containing any user data,

18   information or Personal Identifiable Information). Defendant reposted the stolen Chegg Content on

19   the domain homeworkify.net ("Homeworkify") for Defendant's own benefit. All of Defendant's

20   sophisticated activities far exceed the bounds of normal authorized user activity and have caused

21   and continue to cause irreparable harm to Chegg. Chegg has devoted considerable efforts to

22   identify Defendant and stop Defendant's conduct. However, Defendant has evaded each of these

23   efforts and demonstrated unyielding commitment to Defendant's unlawful activity. It has become

24   apparent that further efforts would only be a continuation of a futile game of Whac-A-Mole.

25   As such, Chegg is left with no other recourse but to respectfully request a Preliminary

26   Injunction disabling and transferring the Homeworkify domain, such that Defendant's illegal

27   activity will cease and the irreparable damage to Chegg can finally be curtailed. In order to

28   effectuate such an order, Chegg requests that the domain registries hosting Homeworkify be

1  ordered to reasonably cooperate to effectuate the order, and that the Homeworkify domain be

2  transferred to Chegg. Defendant has had and will continue to have a full and fair opportunity to

3  contest this request. Chegg has made and will continue to make a robust effort in accordance with

4  the requirements of due process to serve Defendant, using contact information known and

5  maintained by domain infrastructure providers related to the Homeworkify website.

## II.  STATEMENT OF FACTS

### A.  Chegg Has Developed a Reputation as a Trusted Online Learning Platform and Limits Access to Proprietary Chegg Content to Paying Subscribers

Chegg is a leading direct-to-student connected learning platform with an established

reputation for delivering high quality products and services, good customer service, and a tested

commitment to improving educational outcomes of all students—all of which have earned Chegg

high regard amongst its target population, college students. Complaint, ECF No. 1 ("Compl.")

¶¶ 7-8. Chegg's platform uses proprietary technology and tools that have been developed to help

students learn more effectively and efficiently. *See* Declaration of John Heasman in Support of

Plaintiff's Motion for Preliminary Injunction ("Heasman Decl.") ¶ 10. One of Chegg's popular

products is Chegg Study, which consists of a massive library of millions of proprietary step-by-

step solutions to homework and study questions. *Id.* ¶ 11. This Chegg Content is available

exclusively to Chegg's subscribers immediately upon paying a subscription fee. *Id.*

To use the Chegg website and obtain access to Chegg Content, users are required to

register an account, which involves agreeing to Chegg's General Policies as well as its Terms of

Use (together, the "Chegg Policies"). *Id.* ¶ 12. The Chegg Policies prohibit users from sharing

credentials, *id.* ¶ 13; using any Chegg Content for commercial purposes, *id.* ¶ 14; "view[ing],

copy[ing], or procur[ing] content or information from the Services by automated means (such as

scripts, bots, spiders, crawlers, or scrapers)[1], or [using] other data mining technology or processes

---

[1] A script is a program or sequence of instructions that is used to automate a process that would otherwise need to be executed step-by-step. Similarly, a bot is also a software program that performs an automated, often repetitive function. Spiders, crawlers, and scrapers (terms often used interchangeably) are a type of script or program that is used to browse Internet sites in a systematic manner for the purpose of automatically collecting the content of a particular site. Declaration of Amanda Z. Saber in Support of Chegg's Motion for Preliminary Injunction ("Saber Decl.") ¶ 2.

2

to frame, mask, extract data or other materials from the Chegg Content," *id.* Chegg also limits the amount of data a user can download, *id.*, and the number of devices a user can use at any given time; requires multi-factor identification for the addition of new devices, *id.* ¶ 15; and maintains a multitude of systems to protect Chegg against bots, *id.* Additionally, Chegg has made considerable investments in operational security. *Id.* ¶ 16.

### B.      Defendant's Operation of Homeworkify Violates Laws and Exceeds Authorized Chegg Usage

Defendant is the registrant of Homeworkify and the mastermind of the scheme to circumvent Chegg's technical access controls, steal and disseminate Chegg Content, and exploit Chegg's users and brand reputation. *Id.* ¶ 6. Through Homeworkify, Defendant enables individuals to access millions of pieces of proprietary and stolen Chegg Content without a subscription and without Chegg's authorization—free of charge and without registering for an account or agreeing to the Chegg Policies, including the subscriber protections described *infra*. *Id.* ¶ 17.

Based on the millions of Chegg solutions stolen, Chegg has concluded that Defendant accessed Chegg Content in a manner that exceeds Chegg's authorization and is inconsistent with Chegg's Policies. *Id.* ¶ 18. Defendant appears to have used Defendant's authorized registration credentials or trial accounts to access the Chegg website, and then downloaded large volumes of data in violation of numerous provisions of Chegg Policies. *Id.* After Defendant successfully exfiltrated Chegg data at enormous scale (using sophisticated technical means outside the capabilities of a normal Chegg user to access and download Chegg Content in an automated way in order to circumvent content consumption limits), Defendant republished and continues to disseminate that stolen content on Homeworkify.

To access stolen Chegg Content on Homeworkify, visitors are prompted to enter a URL or "link" of a Chegg homework solution that would typically be behind a Chegg paywall. *Id.* ¶ 19. After entering a Chegg link, the process then generally involves the user clicking the "Search" button; the Defendant's website then providing confirmation of whether Chegg Content is available for viewing; and then ultimately providing an option for users of Defendant's website to then view stolen Chegg Content for free. *Id.* Defendant has also abused and continues to abuse

Chegg's logo, name, trademarks, and branding on Homeworkify in blatant disregard and violation of Chegg Policies. *Id.* Defendant also capitalizes on Chegg's reputation to obtain personal contact information of Homeworkify's users in service of Defendant's own schemes. *Id.* ¶ 4. All of Defendant's actions exceed the bounds of authorized use according to Chegg's Policies. *Id.*

### C.   Defendant Is a Sophisticated Technical Actor Capable of Circumventing Chegg's Access Controls

Defendant has been able to evade identification due to a high level of technical sophistication. *Id.* ¶ 7. For example, Defendant has used Cloudflare[2] to mask the location of the Homeworkify infrastructure to avoid identification and detection. *Id.* Ordinary, average student users who use Chegg within the bounds of authorized use are not the type of users who utilize Cloudflare. Upon discovering the existence of Homeworkify, Chegg immediately began to investigate Defendant through conducting regular reviews using standard open-source intelligence data sources, and analyzing site requests and responses to understand the technologies used by Defendant, as well as identifying the relevant hosting providers, Domain Name System Registrars, and indicators of ownership. *Id.* ¶ 20. Because Defendant quickly took refuge behind the anonymization services of Cloudflare, and Chegg was no longer able to utilize its same tools on the site directly to conduct surveillance. *Id.*

Chegg has exhausted numerous avenues to try to stop Defendant, including outreach to individuals believed to potentially be Defendant or associated with Defendant, and the implementation of additional technical safeguards to prevent use of the stolen Chegg Content on the Homeworkify website. *Id.* ¶ 5. Defendant's scheme, however, has proven to be outside the norm of what Chegg has historically faced in protecting its brand and content. Specifically, Defendant was able to access and steal Chegg Content in part by creating and abusing, at scale,

---

[2] Cloudflare provides content delivery network services, serving as a reverse proxy, and also provides web application firewalls and other web security services. When used by bad actors, like Defendant, it can also be used to conceal the actual IP address of server infrastructure at which content associated with a domain name is hosted. Defendant has used the service, among other things, as a way to obfuscate the location and source of Defendant's servers, and demonstrates both an intent to evade identification and anticipation that a party such as Chegg may attempt to uncover the website operator's identity. Saber Decl. ¶¶ 5, 12.

temporary and authorized Chegg free-trial accounts and also by circumventing content consumption limits. *Id.* Chegg has attempted to employ technical means to curtail Defendant's nefarious behavior; however, Defendant has circumvented these efforts and continues Defendant's attempts to steal Chegg Content at scale. *Id.* ¶ 26. For example, Chegg developed a method to attempt to prevent access to images associated with Chegg Content through an unauthenticated link, preventing sites such as Homeworkify from displaying these images. *Id.* ¶ 27. This method was only temporarily successful, however, because Defendant had also downloaded copies of these images and therefore was able to use these saved copies to make the stolen content once again accessible on the Homeworkify website almost immediately after Chegg's method was implemented. *Id.* Additionally, Chegg tested a method of obfuscating the URLs for Chegg Content (in response to Homeworkify's operating model of "enter a Chegg URL, get a solution"). *Id.* ¶ 28. Within two days, Defendant had posted on Homeworkify a tutorial graphic on how to actively circumvent this access control to get the necessary URL to find Chegg's stolen content on the Homeworkify site. *Id.* This evidences Defendant's technical sophistication beyond the general user and Defendant's unwavering commitment to quickly circumventing technical measures implemented by Chegg to halt Defendant's activities more so than any prior or similar incidents that Chegg has addressed to date. *Id.* ¶ 29. It has therefore become clear that Defendant's injurious behavior cannot be stopped through ordinary means; only injunctive relief will halt Defendant's scheme. *Id.* ¶ 30.

### D. Defendant Has Unlawfully Capitalized on Chegg's Trademarks, Brand, Goodwill, and Reputation

Since at least as early as 2003, Chegg has exclusively used the inherently distinctive mark CHEGG to brand educational and entertainment services and products. Compl. ¶ 20. Chegg has since registered and applied for numerous U.S. federal trademark registrations (the "CHEGG Marks"). *Id.* Chegg has invested a substantial amount of time and resources to promote and advertise the inherently distinctive CHEGG Marks, and the goods and services associated with Chegg, including spending more than $200 million to advertise and promote its goods and services under the CHEGG Marks. *Id.* ¶ 22. As a result, Chegg has developed valuable goodwill and an

outstanding reputation in the CHEGG Marks; the CHEGG Marks are extremely well-known among students in the United States and have become exclusively associated in the minds of the public with a single source: Chegg. *Id.*

Defendant exploits Chegg's trademarks, branding, goodwill, and reputation to divert traffic from Chegg's website to Homeworkify's site featuring stolen Chegg Content. Heasman Decl. ¶ 31. For example, Homeworkify advertising at one point announced "Free Chegg Answers" and "unblur Chegg"—thus causing a harmful association between Chegg and Defendant's illegitimate operation. *Id.* At another point, Defendant systematically and purposefully used Chegg's trademark and brand on Homeworkify to attract users to Defendant's unauthorized site and infrastructure. *Id.* ¶ 32. Users have questioned whether Homeworkify is a legitimate site, and sites that track potential scams have given Homeworkify a low rating. *Id.* ¶¶ 34-36. Questions about legitimacy or potential scams pose a serious risk that such negative perceptions will cause the value of Chegg's trademark and brand to be diminished. *Id.* ¶ 37. The public interest is also injured by Defendant, who more recently has started collecting user email addresses via Homeworkify.

### E. Chegg Has Gone to Great Lengths to Unmask Defendant

To date, Chegg has employed numerous means in order to identify Defendant and put a stop to Defendant's wrongful conduct. First, Chegg submitted takedown requests to domain name service providers associated with the Homeworkify domain (as well as many other takedown requests as the investigation continued). Saber Decl. ¶¶ 4-15. Chegg received no response to any of these takedown requests from Defendant or anyone purporting to represent Defendant or act on its behalf. *Id.* ¶ 5. Next, Chegg subpoenaed the registrars and proxy servers connected to three domain names linked to Homeworkify, for disclosure of cloaked registration information. Chegg investigated the contact information it received, but ultimately discovered that it was fraudulent, further demonstrating Defendant's commitment to concealment and evading detection. *Id.* ¶¶ 5, 12. Chegg also sought to depose individuals identified by the Internet Service Providers ("ISPs") that Chegg subpoenaed and through forensic imaging of their computers. This further uncovered Defendant's sophistication and ability to evade detection: the depositions demonstrated that Defendant used peer-to-peer sharing services in excess of platform rules to access each individual

subscriber's respective IP address (*e.g.*, each deponent appears to be yet another victim of a scam perpetrated by Defendant). *Id.* ¶¶ 13-14.

Subsequently, Chegg discovered that the registrant (either Defendant or someone associated with Defendant) paid for the registrations of Homeworkify through bitcoin to further conceal their identify. *Id.* ¶ 9. Chegg hired a cryptocurrency expert to trace the transactions to identify who purchased Homeworkify, but has not been able to determine the owner of the bank account due to the decentralized nature of cryptocurrency. *Id.* Chegg has engaged in extensive investigatory efforts, which have required filing multiple motions for expedited discovery with this Court and waiting for third parties to respond to subpoenas to uncover the next layer of Defendant's concealment, but has not been able to stop Defendant.

**F.     Defendant Has Caused Irreparable Harm to Chegg**

Defendant's unceasing violations of the law have caused and continue to cause significant irreparable injury to Chegg. Heasman Decl. ¶ 4. Unless Defendant is stopped by this Court, Chegg will continue to endure irreparable injury including creating confusion in the marketplace and causing a diminution of Chegg's goodwill. *Id.* Defendant's blatant use of Chegg branding has been on full display in connection with Homeworkify despite Chegg's efforts to stop Defendant. Defendant also causes injury by interfering with relationships between Chegg and its customers and Chegg has suffered the loss of subscribers, revenue, and its intellectual property as a result of Defendant's activities. *Id.* With every passing day that Defendant displays proprietary Chegg Content on Homeworkify, the association between Chegg and Defendant's illicit website grows stronger to the point where users will no longer come to Chegg for Chegg Content. *Id.* ¶ 38. This harm is irreparable for Chegg, whose brand and value is rooted in its proprietary content. *Id.*

**III.    ARGUMENT**

**A.     Chegg Satisfies All Four Elements for a Preliminary Injunction**

Defendant's sophisticated and nefarious actions compel injunctive relief. To be eligible for the requested injunctive relief, Chegg must demonstrate that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm, (3) the balance of hardships tips in its favor, and (4) the injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 24

1   (2008)); *Alaska ex rel. Yukon Flats Sch. Dist. v. Native Vill. of Venetie*, 856 F.2d 1384, 1389 (9th

2   Cir. 1988). In the Ninth Circuit, the test is a "continuum," and a plaintiff is entitled to injunctive

3   relief if "they demonstrate a probable success on the merits and a possibility of irreparable injury

4   or if they demonstrate a fair chance of success on the merits (*i.e.*, serious questions are raised), and

5   the balance of hardships tips sharply in their favor." *Alaska*, 856 F. 2d at 1389. The standard is a

6   flexible one. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011).

### 1.      Chegg Is Likely to Succeed on the Merits

8   Chegg is likely to prevail on the merits of each of its four substantive claims. Chegg's

9   Complaint alleges violations of the Computer Fraud and Abuse Act (18 U.S.C. § 1030) (the

10   "CFAA"); violations the California Comprehensive Computer Data Access and Fraud Act;

11   Trademark Infringement (15 U.S.C. §§ 1114 *et seq.*); and breach of contract. *See* Compl. ¶¶ 49-82.

### a.      Defendant Violated the Computer Fraud and Abuse Act

13   Congress enacted the CFAA specifically to address computer crime. *See, e.g.*, *LVRC*

14   *Holdings LLC v. Brekka*, 581 F.3d 1127, 1130 (9th Cir. 2009), which penalizes a party who:

- intentionally ***exceeds authorized access***, and thereby obtains information from any protected computer, 18 U.S.C. § 1030(a)(2)(C) (emphasis added); or

- knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer, 18 U.S.C. § 1030(a)(5)(A).

19   A "protected computer" is a computer "used in or affecting interstate or foreign commerce or

20   communication." *See Multiven, Inc. v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887, 891 (N.D. Cal. 2010).

21   Any computer with an internet connection qualifies. *See United States v. Nosal*, 676 F.3d 854, 859

22   (9th Cir. 2012). The phrase "exceeds authorized access" means "to access a computer with

23   authorization and to use such access to obtain or alter information in the computer that the accessor

24   is not entitled to obtain or alter." *Van Buren v. United States*, --- U.S. ---, 141 S. Ct. 1648, 1649

25   (Jun. 3, 2021) (citing 18 U.S.C. § 1030(e)(6)).

26   To prevail on a civil CFAA claim, a plaintiff must demonstrate loss and damage in excess

27   of $5,000. The CFAA defines damage as "any impairment to the integrity or availability of data, a

28   program, a system, or information." *NovelPoster v. Javitch Canfield Grp.*, 140 F. Supp. 3d 954,

CROWELL
& MORING LLP
ATTORNEYS AT LAW

961 (N.D. Cal. 2014). Loss is defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Id.* (citing 18 U.S.C. § 1030(e)(11)). Damage focuses on the harm to data and information, while loss refers to monetary harms. *Phillips v. Ex'r of Est. of Arnold*, 2013 WL 4458790, at *4 (W.D. Wash. Aug. 16, 2013). Plaintiffs may aggregate multiple intrusions or violations to meet the $5,000 statutory threshold. *See Sprint Sols. Inc. v. Pac. Cellupage Inc.*, 2014 WL 3715122, at *4 (C.D. Cal. July 21, 2014).

To carry out Defendant's systematic theft of Chegg Content, Defendant intentionally "exceed[ed] authorized access" by accessing and continuing to access the Chegg servers that house Chegg Content—all of which operate with an internet connection, *Nosal*, 676 F.3d at 859; Heasman Decl. ¶ 10—in a manner that exceeds any access authorized by Chegg. *Id.* ¶¶ 5, 17. Specifically, Defendant signed into at least one Chegg account and exfiltrated millions of pieces of Chegg Content using technical and other automated means such as a bot or a scraper, which is in a manner and volume that far exceeds any permissible use under Chegg's Policies and is expressly prohibited under those policies. *Id.* ¶ 14. Defendant circumvented Chegg's technical controls in order to scrape and otherwise illegally obtain the Chegg Content made available on Chegg's servers that Defendant "is not entitled to obtain," *Van Buren*, --- U.S. ---, 141 S. Ct. at 1649; *see also* Heasman Decl. ¶¶ 6, 25, 27, 28 (Defendant is believed to be using bots to scrape Chegg Content and circumvent consumption limits in connection with attempts to gain unauthorized access). Defendant then illegally provided that content for free on the internet on Homeworkify. *Id* ¶ 17.

To date, Chegg has spent over $250,000 in connection with its investigation and attempted amelioration efforts in response to Defendant's violation of Chegg's technical controls. *Id.* ¶ 46.

Because Defendant's egregious behavior constitutes precisely the type of activity the CFAA is designed to prevent, *see, e.g.*, *Facebook, Inc. v. Fisher*, 2009 WL 5095269, at *2 (N.D. Cal. Dec. 21, 2009) (granting injunctive relief under CFAA where defendants were allegedly engaged in a phishing and spamming scheme that harmed the accounts of Facebook users), Chegg

1    is likely to succeed on the merits of its CFAA claim.

2                    **b.    Defendant Violated Section 502**

3            California's state law equivalent of the CFAA, the Comprehensive Computer Data Access

4    and Fraud Act, Section 502 ("Section 502"), prohibits a defendant who "[k]nowingly accesses and

5    without permission alters, damages, deletes, destroys, or otherwise uses any data, computer,

6    computer system, or computer network in order to . . . wrongfully control or ***obtain*** money,

7    property, or ***data*** [or] [k]nowingly accesses and without permission ***takes, copies, or makes use of***

8    ***any data*** from a computer, computer system, or computer network." *Synopsys, Inc. v. Ubiquiti*

9    *Networks*, Inc., 313 F. Supp. 3d 1056, 1073 (N.D. Cal. 2018) (quoting Cal. Pen. Code § 502(c))

10   (emphases added). A defendant's access is "without permission" when he or she "accesses the

11   network in a manner that circumvents technical or code-based barriers in place to restrict or bar a

12   user's access . . . ." *Facebook, Inc. v. Power Ventures, Inc.*, 844 F. Supp. 2d 1025, 1036 (N.D. Cal.

13   2012), *aff'd in part, vacated in part, rev'd in part*, 828 F.3d 1068 (9th Cir. 2016), *and aff'd in part,*

14   *vacated in part, rev'd in part*, 844 F.3d 1058 (9th Cir. 2016). Section 502(e)(1) expressly

15   empowers plaintiffs to obtain injunctive relief against a defendant who violates Section 502.

16   *Facebook, Inc. v. Grunin*, 77 F. Supp. 3d 965, 973 (N.D. Cal. 2015). Courts in this District have

17   previously granted injunctive relief upon a showing that a defendant continued to obtain access in

18   a manner that is not authorized regardless of plaintiff's attempts to halt the access. *Facebook, Inc.*

19   *v. Sluchevsky*, 2020 WL 5823277, at *9 (N.D. Cal. Aug. 28, 2020), *report and recommendation*

20   *adopted*, 2020 WL 5816578 (N.D. Cal. Sept. 30, 2020).

21           Because the "necessary elements of a Section 502 claim do not differ materially from the

22   necessary elements of the CFAA claim," when a Section 502 claim is based on the same facts as

23   the CFAA claim, the analysis of whether there has been a violation is identical. *Multiven, Inc. v.*

24   *Cisco Sys., Inc.*, 725 F. Supp. 2d 887, 895 (N.D. Cal. 2010). Accordingly, for the same reasons

25   Defendant violated the CFAA, so too does Defendant's conduct violate Section 502. Chegg is,

26   therefore, also likely to succeed on the merits of its Section 502 claim.

27                    **c.    Defendant Violated the Lanham Act**

28   Section 1114(1) of the Lanham Act prohibits use of a reproduction, counterfeit, copy, or

"colorable imitation" of a registered mark in connection with the distribution of goods and services where such use is likely to cause confusion or mistake or to deceive. 15 U.S.C. § 1114(1)(a). The Lanham Act also prohibits use of a trademark, any false designation of origin, false designation of fact, or misleading representation of fact which is

> likely to cause confusion, or to cause mistake, or to deceive as to the affiliation connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a).

To establish trademark infringement, a plaintiff must establish that the defendant is "using a mark confusingly similar to a valid, protectable trademark of the plaintiff." *Brookfield Commc'ns, Inc. v. West Coast Entm't,* 174 F.3d 1036, 1046 (9th Cir. 1999). The Ninth Circuit employs the eight *Sleekcraft* factors to determine whether there is a likelihood of confusion:

> (1) the similarity of the marks; (2) the relatedness of the two companies' services;
> (3) the marketing channel used; (4) the strength of [Plaintiff's] mark;
> (5) [Defendant's] intent in selecting its mark; (6) evidence of actual confusion;
> (7) the likelihood of expansion into other markets; and (8) the degree of care likely
> to be exercised by purchasers.

*GoTo.Com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1205 (9th Cir. 2000). In the context of the internet, the first three factors are the most important. *Brookfield*, 174 F.3d at 1034 n.16.

Chegg is likely to prevail on the merits of its Lanham Act claim. As an initial matter, Defendant used Chegg's *actual* trademarks in misleading and false ways to carry out Defendant's scheme. Since the launch of Homeworkify, Defendant has reproduced Chegg trademarks and branding in online advertising via Google and on Homeworkify, infringing Chegg's registered marks. Heasman Decl. ¶¶ 26, 32, 33. Worse, Defendant exploited Chegg's trademark and branding in connection with Homeworkify, thereby risking—indeed, counting on—customer confusion by individuals who mistakenly believe that Homeworkify and Defendant's illicit activity are associated with or somehow endorsed by Chegg. *Id.* ¶¶ 31-34. Consumers searching for Chegg through online searches risk being confused when they see the Chegg marks but are subsequently diverted to the Homeworkify site. *Id.* ¶ 30. This risk is particularly acute here, since users have questioned whether Homeworkify is a legitimate site or a scam. *Id.* ¶¶ 34-36. Because on the one

1  hand Defendant has capitalized on Chegg's trademarks, branding, goodwill, and reputation to

2  attract users, but on the other hand Homeworkify itself is questioned as illegitimate or a potential

3  scam, there is a serious risk that the value and consumer perception of Chegg's brand will be

4  impaired by consumers who associate it with Defendant's untrustworthy, unlawful operation. *Id.*

5  ¶ 34. Given Defendant's demonstrated commitment to circumventing Chegg's attempts to stop

6  Defendant, there is no reason to believe that Defendant will ever stop using Chegg's trademarks

7  and brand to further capitalize on the association with Chegg and Chegg's reputable brand in the

8  education industry. Moreover, there is no reason to believe that any removal of the Chegg marks

9  from Homeworkify will be a permanent removal absent the relief requested.

10        Further, Chegg is likely to prevail because it meets all applicable *Sleekcraft* factors. First,

11  Chegg is the owner of the Chegg trademarks that Defendant has used in connection with

12  Homeworkify. Compl. ¶¶ 20, 76. Second, Defendant did not simply use a *similar mark* to the

13  Chegg mark; rather, Defendant used *the actual* Chegg marks in connection with Defendant's

14  illegal scheme. This establishes likelihood of confusion. Third, Defendant used the *exact same*

15  *marks* in connection with offering the *exact same content* to the *same users* who would otherwise

16  be accessing Chegg Content through the Chegg website. When searching "Chegg free answers" in

17  Google—Homeworkify's site is a top result. Heasman Decl. ¶ 31. Chegg thus satisfies the first

18  three and most important of the *Sleekcraft* factors to establish trademark infringement. *Wecosign,*

19  *Inc. v. IFG Holdings*, Inc., 845 F. Supp. 2d 1072, 1080 (C.D. Cal. 2012) (high likelihood of

20  confusion where mark was nearly identical, both plaintiff and defendant used the internet as their

21  primary marketing channel, and both offer same type of services). Fourth, the recognizability of

22  Chegg's marks is the very reason why Defendant uses them on Homeworkify. Because of Chegg's

23  reputation as "a leading direct-to-student connected online learning platform," Heasman Decl. ¶ 9,

24  Chegg is "well-known and highly-regarded on college campuses throughout the country," Compl.

25  ¶ 8. Its marks are therefore valuable—to Chegg and to Defendant.

26        Fifth and sixth, because the success of Defendant's scheme hinges on convincing

27  customers that Homeworkify is offering Chegg Content, Heasman Decl. ¶ 30, it is clear that as to

28  the users that Defendant is diverting through Google advertising away from Chegg's site, the intent

is to confuse them into believing Homeworkify is associated with or endorsed by Chegg. *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery,* 150 F.3d 1042, 1052 n.11 (9th Cir. 1998) (Additionally, "proof of intent to cause confusion is entitled to *great weight*") (emphasis added). Similarly, since the launch of Homeworkify, consumers have questioned whether Homeworkify is a "scam," demonstrating actual confusion. Heasman Decl. ¶¶ 34-36.

Because Chegg can establish a likelihood of confusion, it is likely to succeed on the merits of its Lanham Act claim. As such, injunctive relief is appropriate. *Century 21 Real Est. Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988) ("Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement."); *Hotmail Corp. v. Van$ Money Pie Inc.*, 1998 WL 388389, at *5 (N.D. Cal. Apr. 16, 1998) (granting preliminary injunction because copying the Hotmail trademarks in "e-mail return addresses" constituted false designation of origin).

### d.   Defendant Breached and Continues to Breach the Chegg Policies

Chegg alleges breach of contract violations with respect to the Chegg Policies. Compl. ¶¶ 69-72. To prevail, Chegg must show: "[(1)] the existence of the contract, [(2)] performance by the plaintiff or excuse for nonperformance, [(3)] breach by the defendant and [(4)] damages." *Prudential Ins. Co. of Am. v. Infinity Funding Corp.,* No. 2011 WL 13228042, at *2 (C.D. Cal. May 31, 2011) (quoting *First Commercial Mortgage Co. v. Reece*, 89 Cal. App. 4th 731, 745 (2001) (granting preliminary injunction upon determining that plaintiff would succeed on the merits of a breach of contract claim under California law).

First, the Chegg Policies constitute valid contracts between Chegg and Defendant, who accessed Chegg Content by signing up for and exploiting user accounts. Heasman Decl. ¶ 25; *In re Facebook Biometric Info. Privacy Litig.*, 185 F. Supp. 3d 1155, 1164-67 (N.D. Cal. 2016) (finding Plaintiff's user-registration process constituted a binding contract on the user). To use the Chegg website and obtain access to the Chegg Content, users are required to register an account with Chegg, which involves agreeing to the Chegg Policies. Compl. ¶ 18; Heasman Decl. ¶ 12.

Second, Chegg performs under the Chegg Policies when it provides access to its platform to users who agree to abide by them. *Facebook, Inc. v. ILikeAd Media Int'l Co. Ltd.*, 2022 WL

2289064, at *4 (N.D. Cal. Feb. 1, 2022), *report and recommendation adopted as modified*, 2022 WL 2289058 (N.D. Cal. Mar. 15, 2022). Chegg did so here, where Defendant was able to access and download Chegg Content after agreeing to the terms of the Chegg Policies.

Third, Defendant violated the Chegg Policies, which include agreeing not to use any Chegg Content for commercial purposes, Heasman Decl. ¶ 14; "view, copy, or procure content or information from the Services by automated means (such as scripts, bots, spiders, crawlers, or scrapers), or use other data mining technology or processes to frame, mask, extract data or other materials from the Chegg Content," *id.*; or exceed data consumption limits, *id.* Defendant breached the Chegg Policies when Defendant used bots or scrapers to download and steal Chegg Content on a massive scale well in excess of allowable data consumption limits, and then disseminated such content commercially on the Homeworkify website. *Id.* ¶¶ 18, 24; Compl. ¶¶ 71-72.

Finally, as discussed in detail in the following section, Defendant's breach of the Chegg Policies has caused Chegg irreparable harm. Compl. ¶ 73; Heasman Decl. ¶¶ 4, 24-25. Chegg is therefore likely to succeed on its breach of contract claim.

## 2. Defendant's Conduct Causes Irreparable Harm to Chegg

Chegg has been and continues to be harmed by Defendant's violations. Reputational injury constitutes irreparable harm. *See Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."); *see Rent-A-Center, Inc. v. Canyon Tele. & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("Harm to business goodwill and reputation is unquantifiable and considered irreparable."). Further, "[i]n trademark cases, irreparable harm is typically found in a plaintiff's loss of control over their business reputation, loss of trade and loss of goodwill." *Maxim Integrated Prod., Inc. v. Quintana*, 654 F. Supp. 2d 1024, 1035 (N.D. Cal. 2009). This "irreparable injury may be presumed from a showing of likelihood of success on the merits." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000). "[T]he reason for the trademark presumption of irreparable injury is that once a probability of proving likelihood of confusion at trial is shown, the trademark owner's business goodwill and reputation are at risk." *Volkswagen AG v. Verdier Microbus & Camper,*

1     *Inc.*, 2009 WL 928130, at *6 (N.D. Cal. Apr. 3, 2009) (citing 4 McCarthy on Trademarks § 30:47).

2         Through Defendant's abuse of the Homeworkify domain, Defendant has irreparably

3 damaged Chegg's reputation by systematically and purposefully using Chegg's trademark and

4 branding in connection with operation of a website that offers stolen content, trading on Chegg's

5 good name to drive traffic to the site for Defendant's own gain. Heasman Decl. ¶ 31. This abuse of

6 Chegg's trademarks and brand has caused irreparable harm stemming from users inaccurately

7 associating Chegg's proprietary and valuable content with a "scam" site that is neither legitimate

8 nor safe to visit. *Id.* ¶ 33. Indeed, to the consternation of Chegg, the reputational harm suffered by

9 Chegg as a result of Defendant's illegal activity has reached the level where individuals have

10 actually questioned if Homeworkify is legitimate or a scam and whether it is associated with

11 Chegg's website or services. *Id.* ¶ 34. This association between Chegg's trademark and brand and

12 Homeworkify poses a serious risk that such negative perceptions cause confusion and decline of

13 the value of Chegg's trademark and brand. This is quintessentially the type of confusion that courts

14 consider to be irreparable. *See Volkswagen*, 2009 WL 928130 at *6.

15         With respect to the harm to Chegg as a result of "loss of trade and loss of goodwill,"

16 *Quintana*, 654 F. Supp. 2d at 1035, Defendant's actions have caused both. Courts have held in

17 CFAA and Section 502 cases that repeated intrusion into a plaintiff's servers using bots to access

18 infrastructure constitutes irreparable harm. *ILikeAd Media*, 2022 WL 2289064, at *6; *see also*

19 *Sluchevsky*, 2020 WL 5823277 at *9 (irreparable harm stemming from defendants' unauthorized

20 acquisition of "data to which [d]efendants h[ad] no lawful right" in violation of the CFAA and

21 Section 502 where defendant was involved in scraping data and unauthorized use of plaintiff's

22 platform). Here, Defendant's use of bots or scrapers to conduct a wholesale download of tens of

23 millions of pieces of Chegg Content, and republication and monetization of that content for

24 Defendant's own gain on Homeworkify, constitutes the type of irreparable harm that supports the

25 requested injunctive relief. *See ILikeAd Media*, 2022 WL 2289064 at *6.

26         The "loss of trade and loss of goodwill" suffered by Chegg also arises from Defendant's

27 repeated circumventions of the technical controls Chegg implemented to protect Chegg Content,

28 enabling Defendant to disseminate Chegg's stolen content on Homeworkify with impunity. Threat

1   of ongoing harm or repeated attempts to circumvent controls is the type of irreparable harm that

2   merits injunctive relief. *Sluchevsky*, 2020 WL 5823277 at *9 (finding irreparable harm where

3   plaintiff argued that it was very likely that defendant would continue to access plaintiff's platform

4   without authorization); *Pyro Spectaculars North, Inc. v. Souza*, 861 F. Supp. 2d 1079, 1092 (E.D.

5   Cal. 2012) ("Where defendants' conduct indicates there is a 'reasonable likelihood of defendant's

6   future violations,' and defendants retain the software, tools or means at issue to continue their

7   harmful behavior, this moves [plaintiff's] second factor in favor of granting a permanent

8   injunction."). Here, Defendant has taken steps to evade identification, and demonstrated an

9   unwavering commitment to detecting and circumventing the technical controls implemented by

10  Chegg. Given Defendant's continued illicit operation of Homeworkify despite months of Chegg's

11  efforts to curtail it, combined with Defendant's technical sophistication, absent injunctive relief,

12  Defendant has and will continue to cause Chegg irreparable harm. Heasman Decl. ¶ 38.

### 3.      The Public Interest Favors an Injunction

14          An injunction would serve the public interest here. With each day that passes, Defendant is

15  involved in further dissemination of Chegg Content, which further causes harm to Chegg, and

16  further deceives members of the public. *See supra*. Moreover, the public interest is clearly served

17  by enforcing statutes designed to protect the public, such as the CFAA and the Lanham Act. *See,*

18  *e.g.*, *Power Ventures, Inc.*, 252 F. Supp. 3d at 785 ("The public has an interest in ensuring that

19  computers are not accessed without authorization."); *Brookfield*, 174 F. 3d at 1066 (injunctive

20  relief is appropriate "to promote the public interest in protecting trademarks generally as well").

21  Courts in this district that have previously granted injunctive relief disabling domains. *F.T.C. v.*

22  *Pricewert LLC*, 2009 WL 1689598, at *1 (N.D. Cal. Jun. 15, 2009) (granting preliminary

23  injunction disconnecting service to botnet hosting company); *Dish Network L.L.C. v. Tan Nguyen*,

24  2012 WL 12896519, at *2 (C.D. Cal. Mar. 12, 2012) (ordering seizure and transfer of domains that

25  were used in connection with software piracy); *Cisco Sys., Inc. v. Shenzhen Usource Tech. Co.*,

26  2020 WL 5199434, at *12 (N.D. Cal. Aug. 17, 2020) (ordering transfer of domain used in

27  connection with trademark infringement).

28          Chegg's requested relief—the transfer of the Homeworkify domain to Chegg's control—is

an appropriate remedy to halt the harm caused by Defendant. Such relief is appropriate and necessary, and is within the Court's broad authority to craft equitable remedies to prevent the irreparable harm that Chegg has suffered and continues to suffer at the hands of Defendant. Federal courts have very broad, inherent equitable authority to craft injunctions for any civil violation of law—including violations of the CFAA. *See, e.g.*, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied."), *quoting Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)); *United States v. Professional Air Traffic Controllers Org.*, 653 F.2d 1134, 1141 (7th Cir. 1981) (statute at issue did not specifically grant injunctive relief; the court considered how to issue an appropriate remedy and resorted to common-law principles to allow the government to seek injunctive relief, observing that "a new statutory remedy is not exclusive and common-law rights and remedies survive unless Congress intended the new remedy to be exclusive" and found "in the absence of indications to the contrary we presume that Congress did not intend the statutory remedies to be exclusive, and because an injunctive remedy is necessary to effectuate the purpose of those provisions, we conclude that an injunction is an available remedy under [relevant statutory provision]"); *Federal Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 412 (1969) ("[T]he legislative grant of a new right does not ordinarily cut off or preclude other nonstatutory rights in the absence of clear language to that effect.").

The CFAA specifically contemplates that "[a]ny person who suffers damage or loss by reason of [its] violation . . . may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g). This evinces a Congressional intent to empower courts to fashion broad remedies to enforce it. Disabling Defendant's malicious domain is well within the Court's broad equitable authority to craft such a remedy and would serve to protect the public from the "scam" website Homeworkify.

### 4.      The Balance of Hardships Tips Sharply in Chegg's Favor

While Chegg has been harmed and continues to be harmed, in contrast, Defendant will suffer *no harm* to any legitimate interest if a preliminary injunction is issued, because Defendant

has no legitimate interest in exploiting Chegg's stolen content. *See Scalia v. Unforgettable Coatings*, Inc., 455 F. Supp. 3d 987, 992 (D. Nev. 2020) (finding balance of hardship weighed in favor of plaintiff as defendants "have no legitimate interest" in violating the law); *Amazon.com, Inc. v. Sirowl Tech.*, 2022 WL 19000499, at *6 (W.D. Wash. Oct. 3, 2022) (where defendant had no legitimate interest in selling infringing goods, balance of hardship weighed in favor of injunction). Because Defendant is engaged in an illegal scheme to defraud and injure Chegg, the balance of equities tips in favor granting an injunction because it is no hardship to be stopped from illegal activity. *See, e.g.*, *ILikeAd Media*, 2022 WL 2289064, at *6 ("The Court also finds that the balance of hardships weighs ***in favor of issuing a permanent injunction***. Given the nature of Defendant's fraudulent activity, deliberately implemented to circumvent Plaintiff's security measures, and the ease with which Defendants could renew their fraudulent scheme, the potential harm to Plaintiff would be great, compared with the lack of harm to Defendants for merely being held to follow the law and refrain from attacking Plaintiff's servers and its customers' accounts.") (emphasis added). Because Defendant has no legitimate interest in perpetrating illegal acts, the fourth preliminary injunction factor—as with the other three—strongly favors Chegg.

### B. The All Writs Act Authorizes the Court to Direct Third Parties to Perform the Necessary Acts to Avoid Frustration of the Requested Relief

Chegg's Proposed Order directs that the third-party domain registrars through which Defendant procured Homeworkify reasonably cooperate to effectuate the order by transferring the domain to Chegg's control in order to mitigate the risk and injury caused by Defendant. These third parties are the only entities that can effectively disable the Homeworkify domain, halt Defendant's illegal activity, and preserve the evidence of Defendant's illegal acts; thus, their cooperation is crucial. Chegg therefore requests this relief under the All Writs Act ("AWA").

The AWA provides that a court may issue all writs necessary or appropriate for the administration of justice. 28 U.S.C. § 1651(a). The Supreme Court has recognized that the AWA can extend to third parties necessary to affect the implementation of a court order:

> The power conferred by the [AWA] extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any

affirmative action to hinder justice.

*United States v. New York Tel. Co.*, 434 U.S. 159, 174 (1977) (citations omitted) (holding that order to telephone company to assist in implementation of a pen register warrant was authorized under the AWA); *see also Plum Creek Lumber Co. v. Hutton*, 608 F.2d 1283, 1289 (9th Cir. 1979) (the AWA "permits the district court, in aid of a valid warrant, to order a third party to provide nonburdensome technical assistance to law enforcement officers").

### 1. Chegg Meets the Threshold Requirements for AWA Relief

There are two steps to any analysis of the AWA as applied to third parties. First, there are three threshold requirements: (1) issuance of the writ must be "in aid of" the issuing court's jurisdiction; (2) the type of writ requested must be "necessary or appropriate" to provide such aid to the issuing court's jurisdiction; and (3) the issuance of the writ must be "agreeable to the usages and principles of law." *In re Apple, Inc.*, 149 F. Supp. 3d 341, 351 (E.D.N.Y. 2016); *see also Saleh v. Titan Corp.*, 353 F. Supp. 2d 1087, 1093 (S.D. Cal. 2004). Chegg has satisfied all three.

First, this action is based on the CFAA and the Lanham Act, so this Court has subject matter jurisdiction, 28 U.S.C. § 331, and therefore has jurisdiction to issue the requested AWA Order. *Benson v. State Bd. of Parole and Prob.,* 384 F.2d 238, 239 (9th Cir. 1967) (AWA may be "invoked by the district court only in aid of jurisdiction which it already has"). Second, an AWA Order is necessary given Defendant's operation of Homeworkify to conduct illegal activity—which takes advantage of the infrastructure and businesses of third-party domain registries and registrars. *New York Telephone*, 434 U.S. at 179 ("Unless appropriately confined by Congress, a federal court may avail itself of all auxiliary writs as aids in the performance of its duties.").

Finally, Chegg's Proposed Order is in concert with established principles of law. When the first two threshold requirements are met, the AWA—which should be "broadly construed"—empowers the court "to achieve all rational ends of law." *Calif. v. M&P Invs.*, 46 F. App'x 876, 878 (9th Cir. 2002). Because of Defendant's technical sophistication, enjoining Defendant without an AWA order directed to domain registries would leave Chegg—and consequently this Court—in the unenviable position of having to continue to play Whac-A-Mole in order to enforce the injunction. *See, e.g., Arista Records, LLC v. Tkach,* 122 F. Supp. 3d 32, 34 (S.D.N.Y. 2015)

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1   (noting that, in a domain name seizure case, "Plaintiffs explain that they were then drawn into

2   what they describe as a technological globetrotting game of 'whack-a-mole' in an effort to enforce

3   the TRO"). Anything short of complete disruption of Defendant's illegal operation will have little

4   to no effect, as Defendant—who has demonstrated technical skill and means—will simply be able

5   to reassert control and render the Court's injunction a nullity.

6           **2.     An AWA Order is Warranted for the Third-Party Domain Registry
                      and Registrars**

7

8           Assuming the threshold requirements of the AWA are met, *New York Telephone* directs

9   courts to consider the following three requirements for third party writs: "(1) the third party must

10  be closely connected with the underlying controversy . . . ; (2) the order must not adversely affect

11  the basic interests of the third party or impose an undue burden; [and] (3) the assistance of the third

12  party must be absolutely necessary." *United States v. Hall*, 583 F. Supp. 717, 719 (E.D. Va. 1984).

13          Here, the third-party domain registry and registrars identified in Chegg's Proposed Order

14  are closely connected to Defendant's injurious behavior in that they provide the vehicle through

15  which Defendant is able to disseminate the Chegg Content that Defendant stole. Their assistance is

16  therefore "absolutely necessary" to any permanent injunction this Court orders. *See id.* Unless

17  Defendant's domains are transferred away from Defendant's control, Defendant will be able to

18  continue to violate the law—as Defendant has to date.

19          As to the second requirement for third-party writs, requiring the domain registry and

20  registrars to reasonably assist in the execution of the injunction will not offend due process, as the

21  Proposed Order (1) requires only minimal assistance from the third parties in executing the order

22  (acts they would take in the ordinary course of operations), (2) requires that it be implemented with

23  the least degree of interference with the normal operation of third parties, (3) does not deprive the

24  third parties of any tangible or significant property interests, and (4) requires Chegg to compensate

25  the third parties for the assistance rendered. If, in the implementation of the Proposed Order, any

26  third party wishes to bring an issue to the attention of the Court, Chegg will do so immediately.

27  The directions to third parties in the Proposed Order are narrow, satisfy due process, and are

28  necessary to effect the requested relief and ensure that the relief is not rendered fruitless.

1    Without an accompanying AWA order to the third-party registry and registrars enabling

2   Defendant, any order from this Court would be evaded and thwarted. This is precisely the type of

3   situation that cries out for the AWA. *See In re Application of United States for an Order*

4   *Authorizing An In-Progress Trace of Wire*, 616 F.2d 1122, 1129 (9th Cir. 1980) (noting of *New*

5   *York Telephone*, "the Court made the commonsense observation that, without the participation of

6   the telephone company, 'there is no conceivable way in which the surveillance authorized could

7   have been successfully accomplished'"); *Dell Inc. v. BelgiumDomains, LLC*, 2007 WL 6862341, at

8   *6 (S.D. Fla. Nov. 21, 2007) (applying AWA in conjunction with trademark seizure under Rule 65

9   and Lanham Act and directing third party Verisign to take certain actions on certain domain

10   names).

11       **C.     A Preliminary Injunction Is the Only Effective Means of Relief and Alternative
             Service Is Warranted Under the Circumstances**

12

13       Chegg also seeks an order allowing it to serve Doe Defendant via alternative service

14   methods. First, legal notice and service by email, facsimile, mail, and publication satisfy due

15   process as these means are reasonably calculated, in light of the circumstances, to apprise the

16   interested parties of the preliminary injunction hearing and the lawsuit. *See Mullane v. Cent.*

17   *Hanover Bank & Tr. Co.,* 339 U.S. 306, 314 (1950). Such methods are also authorized under

18   Federal Rule of Civil Procedure 4(f)(3), which allows a party to serve defendants by means not

19   prohibited by international agreement. The methods of notice and service proposed by Chegg

20   below have been approved in other cases involving international defendants attempting to evade

21   authorities. *See, e.g.*, *Rio Properties, Inc. v. Rio Int'l Interlink,* 284 F.3d 1007, 1014-15 (9th Cir.

22   2002) (authorizing service by email upon an international defendant); *Elsevier, Inc. v. Siew Yee*

23   *Chew*, 287 F. Supp. 3d 374, 379-80 (S.D.N.Y. 2018) (finding that in trademark infringement

24   action, proposed means of service on foreign defendants via email satisfied constitutional

25   standards of due process); *AllscriptsMisys, LLC v. Am. Dig. Networks, LLC,* 2010 U.S. Dist.

26   LEXIS 4450, at *3 (D. Md. Jan. 20, 2010) (granting *ex parte* TRO and order prompting "notice of

27   this Order and Temporary Restraining Order [] can be effected by telephone, electronic means,

28   mail or delivery services"). Alternative service is particularly warranted in cases such as this one

involving Internet-based misconduct causing immediate, irreparable harm. Per the Ninth Circuit:

> [Defendant] had neither an office nor a door; it had only a computer terminal. If any method of communication is reasonably calculated to provide [Defendant] with notice, surely it is email—the method of communication which [Defendant] utilizes and prefers. . . . Indeed, when faced with an international e-business scofflaw, playing hide-and-seek with the federal court, email may be the only means of effecting service of process.

*Rio Properties, Inc.,* 284 F.3d at 1018.

Here, the email addresses provided by Defendant to the domain registrars in the course of obtaining services that support Defendant's operation of Homeworkify are likely to be the most accurate and viable means of notice and service. Moreover, Defendant already agreed to receiving communications via email about his use of the hosting providers' and domain registrars' services in the contracts Defendant entered into with them. *See Nat'l Equip. Rental, Ltd. v. Szukhent,* 375 U.S. 311, 315-16 (1964) ("And it is settled . . . that parties to a contract may agree in advance to submit to the jurisdiction of a given court, to permit notice to be served by the opposing party, or even to waive notice altogether."). For these reasons, notice and service by email and publication are warranted and necessary here, as follows:[3]

<u>Chegg Will Provide Notice to Defendant by Personal Delivery</u>: Chegg has identified the domains which Defendant is currently in control of and, pursuant to the preliminary injunction, will obtain from the domain registrars/registries of those domains any and all physical addresses of the Defendant, to the extent those are available or not fictitious. Pursuant to Rules 4(e)(2)(A) and 4(f)(3), Chegg plans to effect formal notice of the preliminary injunction hearing and service of the Complaint by personal delivery of the summons, Chegg's Complaint, the instant motion and supporting documents, and any Order issued by this Court to such addresses in the United States. Saber Decl. ¶ 19.

---

[3] To the extent that any physical addressees provided by Defendant to hosting companies turn out to be false and Defendant's whereabouts are unknown, the Hague Convention will not apply in any event and alternative means of service, such as email and publication, would be appropriate for that reason as well. *See U.S. S.E.C. v. Shehyn,* 2008 WL 6150322, at *3 (S.D.N.Y. Nov. 26, 2008) ("The Hague Convention does not apply in cases where the address of the foreign party to be served is unknown.") (quoting *BP Prods. N. Am., Inc. v. Dagra*, 236 F.R.D. 270, 271 (E.D. Va. 2006)).

1   / / /

2   <u>Chegg Will Provide Notice by Email, Facsimile, and U.S. Mail</u>: Chegg has identified email

3   addresses associated with Defendant, and will further identify mailing addresses, and/or facsimile

4   numbers associated with Defendant pursuant to the terms of the requested preliminary injunction.

5   *Id*. ¶ 16. Chegg will provide notice of the preliminary injunction hearing and will effect service of

6   the Complaint by immediately sending the same pleadings described above to the email addresses,

7   facsimile numbers, and mailing addresses that Defendant has provided to registrars and registries.

8   *Id*. ¶ 17. When Defendant registered for Homeworkify, it agreed not to engage in abuse such as

9   that at issue in this case and agreed that notice of disputes regarding hosting could be provided to

10  Defendant by sending complaints to the email, facsimile, and mail addresses provided by

11  Defendant to the registrars and registries. *Id.*¶¶ 21-35.

12  <u>Chegg Will Provide Notice by Personal Delivery and Treaty If Possible</u>: If valid physical

13  addresses of Defendant can be identified, Chegg will notify Defendant and serve process upon

14  Defendant by personal delivery or through the Hague Convention on service of process or similar

15  treaty-based means where applicable. *Id.* ¶ 20.

16  **IV.   CONCLUSION**

17          For the foregoing reasons, Chegg respectfully requests that the Court enter the preliminary

18  injunction enjoining Defendant from (1) accessing the Chegg website in a manner that exceeds the

19  authorization granted under the Chegg Policies, (2) downloading, scraping, using, or disseminating

20  Chegg Content, (3) operating the Homeworkify website, and (4) using and infringing Chegg's

21  trademark. Chegg further requests that the Court enter the preliminary injunction and order the

22  transfer of the Homeworkify domain to Chegg, and order that the means of notice of the

23  //

24  //

25  //

26  //

27  //

28  //

1    preliminary injunction hearing and service of the Complaint set forth herein meet Fed. R. Civ. P.

2    4(f)(3), satisfy due process, and are reasonably calculated to notify Defendant of this action.

3                                             Respectfully submitted,

4    Dated:  June 2, 2023                    By:      _____/s/ Gabriel M. Ramsey_____
                                                      Gabriel M. Ramsey
5                                                     Jennie Wang VonCannon
                                                      Amanda Z. Saber
6                                                     Garylene Javier

7                                                     Attorneys for Plaintiff CHEGG, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28