COOLEY LLP
JOHN H. HEMANN (165823)
(jhemann@cooley.com)
RYAN C. STEVENS (306409)
(rstevens@cooley.com)
HAMASEH SOROOSHIAN (345969)
(hsorooshian@cooley.com)
3 Embarcadero Center, 20th Floor
San Francisco, California 94111-4004
Telephone:     +1 415 693 2000
Facsimile:     +1 415 693 2222

TIANA DEMAS
(tdemas@cooley.com) (*Admitted Pro Hac Vice*)
110 N. Wacker Drive, 42nd Floor
Chicago, IL 60606
Telephone:     +1 312 881 6500
Facsimile:     +1 312 881 6598

Attorneys for Plaintiff
CHEGG, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CHEGG, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>VIKASA SWAMI, A/K/A @THEVIIKASH,<br>AND JOHN DOES 1-3,<br><br>    Defendant(s). | Case No. 3:22-cv-07326-CRB<br><br>**PLAINTIFF CHEGG, INC.'S RENEWED<br>MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge:  Charles R. Breyer<br>Courtroom:  6, 17th Floor |

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ....................................................................................................... 2

II.   PROCEDURAL HISTORY ...................................................................................... 4

III.  ARGUMENT ........................................................................................................... 5

      A.   Alternate Service is Appropriate Because Defendants are in India ...................... 5

      B.   Chegg's Requested Relief is Warranted ............................................................... 8

           1.   Chegg is likely to succeed on the merits of its CFAA claims..................... 9

                a.   Defendants accessed individual Chegg accounts without
                     authorization by taking over and using existing Chegg
                     accounts to copy and steal Chegg Content.................................... 9

                b.   The Evidence Chegg has developed shows that a DDoS
                     attack in violation of 18 U.S.C. § 1030(a)(5)(A) was
                     perpetrated by Defendants.......................................................... 14

           2.   Chegg is likely to succeed on its Section 502 claim. .............................. 15

           3.   Chegg is likely to succeed on the merits of its new UCL 17200
                claim. ................................................................................................... 15

      C.   Chegg Will Suffer Irreparable Harm Because the Damages It is Suffering
           are Immeasurable and Will Not End With the Imposition of an
           Uncollectable Money Judgment......................................................................... 16

           1.   Homeworkify has continued to access Chegg's website through
                account takeovers, even after receiving the Cease-and-Desist letter. ....... 17

           2.   Homeworkify is interfering with Chegg's property rights on an
                ongoing basis, and Chegg is losing customers in increasing
                numbers. ............................................................................................... 18

      D.   Chegg Seeks the Only Available Remedy That Will Stop the Illegal Use of
           Its Content ...................................................................................................... 21

IV.   CONCLUSION ....................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AmeriPOD LLC v. DavisREED Constr. Inc.*,
   No. 17-cv-00747, 2017 WL 2959351 (S.D. Cal. July 11, 2017) ........................................... 16

*Application of U.S. of Am. for an Ord. Authorizing an In-Progress Trace of Wire Commc'ns Over Tel. Facilities*, 616 F.2d 1122, 1129 (9th Cir. 1980)................................... 23

*Assef v. Does 1-10*,
   No. 15-CV-01960-MEJ, 2016 WL 1191683 (N.D. Cal. Mar. 28, 2016)................................. 8

*In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*,
   770 F.2d 328 (2d Cir. 1985)................................................................................................... 22

*Berryman v. Merit Prop. Mgmt., Inc.*,
   152 Cal. App. 4th 1544 (2007) .............................................................................................. 16

*BHRAC, LLC v. Regency Car Rentals, LLC*,
   No. CV 15-865-GHK MANX, 2015 WL 3561671 (C.D. Cal. June 4, 2015) ........................ 14

*Cortez v. Purolator Air Filtration Products Co.*,
   23 Cal. 4th 163 (2000) ........................................................................................................... 16

*Disney Enterprises, Inc. v. VidAngel, Inc*,
   869 F.3d 848 (9th Cir. 2017)................................................................................................... 19

*Elsevier, Inc. v. Siew Yee Chew*,
   287 F. Supp. 3d 374 (S.D.N.Y. 2018)...................................................................................... 8

*Facebook, Inc. v. BrandTotal Ltd.*,
   499 F. Supp. 3d 720 (N.D. Cal. 2020) ................................................................................... 19

*Facebook, Inc. v. Grunin*,
   77 F. Supp. 3d 965 (N.D. Cal. 2015) ..................................................................................... 18

*Facebook, Inc. v. Power Ventures, Inc.*,
   844 F.3d 1058 (9th Cir. 2016)........................................................................................... 10, 11

*Facebook, Inc. v. Sluchevsky*,
   No. 19-CV-01277-JSC, 2020 WL 5823277 (N.D. Cal. Aug. 28, 2020), *report and recommendation adopted*, No. 19-CV-01277-YGR, 2020 WL 5816578 (N.D. Cal. Sept. 30, 2020)......................................................................................................... 18

*Farmers Ins. Exch. v. Superior Ct.*,
   2 Cal. 4th 377 (1992) ............................................................................................................. 16

*Future Motion, Inc. v. Doe*,
   No. 21-cv-03022-JSC, 2021 WL 3052594 (N.D. Cal. July 20, 2021)...................................... 8

**MOTION FOR PRELIMINARY INJUNCTION
3:22-CV-07326-CRB**

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Goes Int'l, AB v. Dodur Ltd.*,
No. 14–CV–5666 LB, 2015 WL 1743393 (N.D. Cal. Apr. 16, 2015)......................................... 8

*Hanover Am. Ins. Co. v. Tattooed Millionaire Ent., Inc.*,
No. 2:16-CV-2817-JPM-TMP, 2017 WL 354266 (W.D. Tenn. Jan. 24, 2017) .................... 21

*hiQ Labs, Inc. v. LinkedIn Corp.*,
31 F.4th 1180 (9th Cir. 2022) ............................................................................................ 10, 11

*Integrated Waste Sols., Inc. v. Goverdhanam*,
No. CIV.A. 10-2155, 2010 WL 4910176 (E.D. Pa. Nov. 30, 2010)..................................... 14

*Korea Supply Co. v. Lockheed Martin Co.*,
29 Cal.4th 1134 (2003) ........................................................................................................ 16

*Lakeview Tech., Inc. v. Robinson*,
446 F.3d 655 (7th Cir. 2006)................................................................................................. 21

*Makekau v. State*,
943 F.3d 1200 (9th Cir. 2019)............................................................................................... 22

*Microsoft Corp. v. Does 1–2*,
No. 20-CV-1217 LDH/RER, 2021 WL 4260665 (E.D.N.Y. Sept. 20, 2021) ...................... 23

*Microsoft Corp. v. Does 1–51*,
No. 1:17-CV-4566, 2017 WL 10087886 (N.D. Ga. Nov. 17, 2017) ..................................... 23

*Microsoft Corp. v. Does 1-18*,
No. 1:13CV139 LMB/TCB, 2014 WL 1338677 (E.D. Va. Apr. 2, 2014) ............................ 23

*Microsoft Corp. v. John Does 1–82*,
No. 3:13-CV-00319-GCM, 2013 WL 6119242 (W.D.N.C. Nov. 21, 2013) ........................ 23

*Millennium TGA, Inc. v. Leon*,
No. 12-CV-01360 MKB, 2013 WL 5719079 (E.D.N.Y. Oct. 18, 2013)............................... 10

*Multiven, Inc. v. Cisco Sys., Inc.*,
725 F. Supp. 2d 887 (N.D. Cal. 2010) ................................................................................ 9, 16

*Oas v. Rama Cap. Partners, LLC*,
No. 820-CV-01634 MCS/ADS, 2020 WL 7786546 (C.D. Cal. Nov. 18, 2020) ................... 16

*Quelimane Co. v. Stewart Title Guar. Co.*,
19 Cal. 4th 26 (1998), *as modified* (Sept, 1998) ................................................................ 16

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*,
944 F.2d 597 (9th Cir. 1991)................................................................................................. 19

Cooley LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Rio Properties, Inc. v. Rio Int'l Interlink*,
    284 F.3d 1007 (9th Cir. 2002).................................................................................................. 8

*Sprint Spectrum L.P. v. Mills*,
    283 F.3d 404 (2d Cir. 2002)..................................................................................................... 22

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001)............................................................................................... 19, 20

*Svanaco, Inc. v. Brand*,
    417 F. Supp. 3d 1042 (N.D. Ill. 2019) .................................................................................... 14

*Sw. Marine, Inc. v. Triple A Mach. Shop, Inc.*,
    720 F. Supp. 805 (N.D. Cal. 1989) ......................................................................................... 16

*Tagged, Inc. v. Does 1 through 10*,
    No. C 09-01713 WHA, 2010 WL 370331 (N.D. Cal. Jan. 25, 2010)..................................... 18

*Ubisoft, Inc. v. Kruk*,
    No. CV 20-478-DMG (ASX), 2021 WL 3472833 (C.D. Cal. July 9, 2021) .......................... 14

*United Spinal Ass'n v. Bd. of Elections in City of New York*,
    No. 10-CIV-5653 (DAB/HBP), 2017 WL 8683672 (S.D.N.Y. Oct. 11, 2017),
    *report and recommendation adopted*, No. 10-CV-5653 (DAB), 2018 WL
    1582231 (S.D.N.Y. Mar. 27, 2018) ......................................................................................... 22

*United States v. New York Tel. Co.*,
    434 U.S. 159 (1977).............................................................................................................. 22, 23

*United States v. Nosal*,
    676 F.3d 854 (9th Cir. 2012).................................................................................................... 10

*United States v. Nosal*,
    844 F.3d 1024 (9th Cir. 2016).............................................................................................. 10, 11

*Van Buren v. United States*,
    141 S. Ct. 1648 (2021) ............................................................................................................. 10

**Statutes**

18 U.S.C.
    § 1030.................................................................................................................................*passim*
    § 1114........................................................................................................................................ 4
    § 1125(a) ........................................................................................................................... 3, 4, 16

28 U.S.C. § 1651 ............................................................................................................................ 21

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

All Writs Act ................................................................................................ 21, 22, 23

Cal. Bus. & Prof. Code § 17200 ("UCL") ....................................................... 2, 3, 4, 16

Cal. Penal Code § 502 ........................................................................................... *passim*

Comprehensive Computer Data Access and Fraud Act ........................................ 15, 16

Penal Code § 502 .................................................................................................. *passim*

**Other Authorities**

Federal Rule of Civil Procedure
    4(f)(3) ....................................................................................................... 3, 8, 24
    65 ..................................................................................................................... 1

Local Rule
    7-2 ..................................................................................................................... 1
    65-2 ................................................................................................................... 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PLEASE TAKE NOTICE** that, as soon as this matter may be heard, in Courtroom 6, 17th Floor, 450 Golden Gate Avenue, San Francisco, California before the Honorable Charles R. Breyer, Plaintiff Chegg, Inc. will and hereby does move for a preliminary injunction and an order authorizing alternative service under Federal Rules of Civil Procedure 4 and 65 and Local Rule 7-2 and 65-2.

This Motion is based upon the attached Memorandum of Points and Authorities, the Declaration of Yan Huang ("Huang Decl."), the Declaration of Jared Hudson ("Hudson Decl."), the Declaration of John Heasman ("Heasman Decl."), the Declaration of Ryan Stevens ("Stevens Decl."), the pleadings and evidence in this action, and such additional argument or evidence as may be presented at the hearing.

## I.     INTRODUCTION

Plaintiff Chegg, Inc. ("Chegg") submits this renewed motion for alternative service and a preliminary injunction ("Renewed Motion"). Chegg respectfully requests that the Court consider the motion on shortened time given the urgency of this matter and has filed a separate motion requesting such relief.

On July 3, 2023, the Court issued an order on Chegg's first motion seeking alternative service and an injunction (the "July 3 Order"). While the Court ruled in Chegg's favor on certain issues—likelihood of success on the merits of its trademark and contract claims, and that the balance of equities tips in Chegg's favor and the public interest favors an injunction—the Court identified some deficiencies in the factual record that stood in the way of granting the motion. The Court invited Chegg to return to the Court with additional factual support for the motion.

Chegg has further developed the factual record, filed a first amended complaint ("FAC"), and now renews its motion for alternative service and a preliminary injunction. In the declarations submitted with this Renewed Motion, supported by the authorities and argument below, Chegg has addressed the Court's concerns and has provided evidence that fully supports the relief sought. Specifically:

- Chegg submits evidence showing that Defendants, including Defendant Swami, are operating from India and alternative service is therefore appropriate.

- Chegg also submits evidence showing a likelihood of success on the merits of its Computer Fraud and Abuse Act ("CFAA") and Penal Code Section 502 claims, which it has amended, in important respects:

  - Part of Defendants' scheme to obtain Chegg content involved taking over Chegg accounts belonging to existing Chegg customers by using credentials obtained from other platforms and using those accounts to access Chegg's website *without authorization* to steal Chegg content, which Defendants make available on Homeworkify and related domains.

  - Defendants also launched a massive DDoS attack against Chegg.com, which occurred immediately after Defendants received notification that Chegg was

seeking to take down Homeworkify. An IP address directly associated with Defendant Swami was used in the attack.

- Chegg amended its complaint to allege a cause of action under the California Unfair Competition Law (the "UCL"). This cause of action is predicated on the evidence of unlawful conduct adduced by Chegg, including Defendants' violations of the CFAA, Section 502, and the Lanham Act. The UCL is intended to allow California businesses like Chegg to obtain injunctions against unlawful, unfair, and fraudulent business practices like those being perpetrated by Defendants.

- Chegg is suffering irreparable injury, and the harms to Chegg cannot be redressed through money damages because they are not readily measurable or compensable in dollars. First, the Declaration of John Heasman ("Heasman Decl.") shows that Defendants are accessing Chegg subscriber accounts without authorization (by obtaining credentials compromised in other platforms' data breaches), and they are using these Chegg accounts to steal proprietary Chegg content, undermining Chegg's ability to control its platform. Second, the Declaration of Yan Huang ("Huang Decl.") shows that Chegg is losing customers and subscriptions on an ongoing and likely increasing basis because Defendants are making Chegg's solutions available for free on a competing website. The harm from losing significant numbers of customers and potential customers is immeasurable. Third, even if money damages were calculable, the Defendants in this case are almost certainly judgment-proof and beyond the Court's reach.

The new evidence Chegg submits, supported by the argument and authorities below, demonstrates that the Renewed Motion should be granted and the requested relief ordered. In addition to ordering alternative service under Fed. R. Civ. P. 4(f)(3), Chegg requests an injunction prohibiting Defendants from: (1) accessing Chegg's website without authorization; (2) downloading, scraping, using, or disseminating Chegg's proprietary content from Chegg.com; (3) operating the Homeworkify website and related domains; and (4) using and infringing Chegg's trademarks. Chegg seeks an order requiring and/or requesting that Homeworkify's hosting

providers seize its domains and transfer them to Chegg. Without the transfer remedy, the Court will have no effective way to prevent Homeworkify from continuing to engage in its illegal and deeply harmful conduct. Alternatively, the Court can order the providers to shut down Homeworkify's domains.

Finally, Chegg respectfully requests that the Court order the requested relief immediately. The evidence submitted with this Renewed Motion addresses the Court's prior concerns and fully supports the requested relief. If the Court's has any doubts about the propriety of the requested relief, Chegg respectfully requests a hearing on the Renewed Motion. As described in the Declaration of Yan Huang, the 2023-2024 school year is about to begin, and back-to-school is Chegg's most active period for new subscribers. An injunction is especially essential at this time to prevent Defendants' illegal conduct from disrupting this critical time for Chegg's business.

## II. PROCEDURAL HISTORY

On November 18, 2022, Chegg filed a complaint alleging violations of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502; breach of contract; and trademark infringement under the Lanham Act, 18.U.S.C. §§ 1114 and 1125(a). (dkt. 1).

On June 2, 2023, Chegg filed a motion for alternative service and a motion for a preliminary injunction, which the Court heard on June 30, 2023 ("Motion"). (dkt. 33; 39-1). Following that hearing, on July 3, 2023, the Court issued an order denying the Motion without prejudice to refile if Chegg could provide additional factual support (the "July 3 Order"). (dkt. 40).

On August, 16, 2023, Chegg filed the FAC, containing seven causes of action, including violations of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502; breach of contract; trademark infringement under the Lanham Act; and California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq*. (dkt. __). Chegg now files this Renewed Motion for a preliminary injunction, supported by new factual evidence Chegg discovered after the Motion was filed and argued, in addition to amended CFAA allegations, and a new UCL claim.

## III.     ARGUMENT

In its July 3 Order, the Court identified certain deficiencies that Chegg might remedy and thereafter renew its motion for alternative service and a preliminary injunction. As to alternative service, the Court found that Chegg had "failed to demonstrate that Homeworkify is a foreign entity." (dkt. 40 at 2). As to the preliminary injunction, the Court found that Chegg had "failed to demonstrate that Homeworkify's continued operation causes Chegg irreparable harm," and stated that if Chegg could demonstrate that Homeworkify continued accessing Chegg.com *after* receiving a cease-and-desist-letter, this could show irreparable harm. *Id* at 2-3. The Court also suggested that if Chegg could show a connection between Homeworkify and a recent cyberattack against Chegg.com, this also could show irreparable harm. *Id.* at n.4. In this memorandum, Chegg specifically addresses these issues.

Chegg does not address the issues on which the Court ruled in its favor, specifically: (a) that Chegg is likely to succeed on the merits of its breach of contract and trademark claims; and (b) that the balance of equities tips in Chegg's favor and (c) the public interest favors an injunction. (dkt. 40 at 7-9, 10-11). Chegg incorporates by reference the discussion of the legal standards applicable to alternative service and preliminary injunctions set forth in the Motion. (dkt. 33)

### A.     Alternate Service is Appropriate Because Defendants are in India

Chegg seeks an order allowing it to serve Defendants via alternative methods, specifically: by email and by Telegram, a messaging application. In its July 3 Order, the Court denied Chegg's request to serve Defendants by email without prejudice and suggested that Chegg provide additional evidence that "the person or entity behind Homeworkify is based outside the United States." (dkt. 40 at 7.) Chegg now has unequivocal evidence that the only identifiable person behind Homeworkify is based in India, as set forth in the First Amended Complaint ("FAC"), the Hudson Declaration, and the Heasman Declaration. The Doe Defendants also appear to be based in India. *See* Hudson Decl. ¶¶ 13-15; *see also* Stevens Decl. ¶¶3-8.

As the Hudson Declaration makes clear, multiple people appear to help run Homeworkify, one of whom resides in India, goes by the names Vikasa Swami, and uses the online identity @theviikash. Hudson Decl. ¶¶ 11-12. Defendant Swami was identified by Nisos, a cyber threat

intelligence investigation firm hired by Chegg, in late June 2023, after the Motion was filed. *Id.* ¶ 2, 11. Chegg turned to Nisos because the information Chegg obtained from various internet service providers ("ISPs") in response to third-party subpoenas did not reveal Defendants' identities or locations. Heasman Decl. ¶10.

Nisos identified Defendant Swami by joining various Telegram channels and groups[1] devoted to Homeworkify and free Chegg solutions. These channels included "Homeworkify.net," "Free Chegg Alert," and "Unblur Chegg Answers." Hudson Decl. ¶¶ 9-13. The administrator of the Telegram group Homeworkify.net uses the handle "@theviikash." *Id* ¶ 11. A Nisos investigator communicated with @theviikash over the course of many days, posing as a person who needed help getting free Chegg solutions on Homeworkify. *Id.* During these communications, @theviikash admitted to running Homeworkify, described himself as a Chegg "expert," and shared a screenshot of a subscriber-only Chegg portal to which @theviikash had access. *Id.* @theviikash stated he lives in Rajasthan, India near Bikaner.[2] *Id.* In addition, the @theviikash generally responded to Telegram messages at times consistent with India Standard Time. *Id.* On June 21, 2023, while communicating with @theviikash on Telegram, a Nisos investigator sent a hyperlink containing an embedded token that, when opened, revealed @theviikash's IP address: 152.58.73.52.[3] Hudson Decl. ¶ 11. This IP address resolved to Jaipur, the capital of Rajasthan. *Id.* The same link was accessed on the same day from another IP address, 192.42.116.184, which resolves to a TOR node.[4] *Id.* The use of TOR is associated with criminal commercial activity, as its purpose to anonymize communications

---

[1] Telegram is an encrypted, cloud-based instant messaging service on which users can communicate 1:1 or create groups for up to 200,000 people or channels for broadcasting to unlimited audiences. Telegram is popular among cybercriminals because, among other things, it is fast, encrypted, and does not require users to give their phone numbers to other users. Instead, Telegram users are identified by their usernames or "handles." Telegram channels permit one-way communications, and the channel administrator can broadcast announcements to channel members. Telegram groups permit two-way communications, where group members can communicate with each other.

[2] Bikaner is located near the eastern border of Pakistan.

[3] An Internet Protocol address ("IP") is a numerical label such as 192.0.2.1 that is connected to a computer network that uses the Internet Protocol for communication. An IP address serves two main functions: network interface identification, and location addressing.

[4] TOR, short for "The Onion Router," is a free and open-source software for enabling anonymous communication. It directs internet traffic via a free, worldwide, volunteer overlay network consisting of TOR "nodes," which receive traffic on the TOR network and pass it along. Using TOR makes it more difficult to track a user's internet activity. Homeworkify also uses TOR.

1   (which generally is not something legitimate businesses do). *Id.* ¶ 11, n.4.

2         While communicating with Nisos, @theviikash shared his Instagram handle:

3   "vikasaswami." *Id.* ¶ 12. The Instagram account has a profile photo of a bald eagle and describes

4   the account owner as a student. *Id.* The Instagram account is tied to a Gmail account,

5   vikasaswami[@]gmail.com, and the name Vikasa Swami. *Id*. A Twitter account, @vikasswami,

6   has the same bald eagle profile photo as the Instagram account mentioned above, as well as a profile

7   photo of a South Asian male wearing a Covid mask, who appears to be approximately 18 to 22

8   years old, sitting down at a table in what appears to be a restaurant. *Id.* Based on Chegg's

9   investigation, @theviikash, who professed to running Homeworkify, is a student in Rajasthan, India

10  named Vikasa Swami. *Id.* On August 11, 2023, @theviikash provided the following email address

11  to Nisos: vik90571[@]gmail.com. *Id.*  Defendant Swami did not provide his precise physical

12  address, and Chegg does not have it. Heasman Decl. ¶ 10.

13        Nisos communicated with at least three other individuals on Telegram, John Does 1–3, who

14  administered or actively participated in groups or channels about Homeworkify and/or obtaining

15  free Chegg content. Hudson Decl.  ¶¶13-15. For example, the Telegram channel "Free Chegg Alert"

16  contains regular updates about Homeworkify, including links to all previous and current

17  Homeworkify sites, and the channel sent broadcasts to subscribers when Homeworkify was down

18  or was under construction. *Id.* Shortly before Homeworkify[.]net launched, the "Free Chegg Alert"

19  channel broadcasted the following message: "Guys we are working on our website shortly we will

20  launch it in 7-10 days." *Id*. ¶13. The same channel sent a broadcast in February 2023 with links to

21  Homeworkify.net, Homeworkify.eu that read: "Use our websites. ***Working perfectly***. "Free Chegg

22  Alert" is a Telegram channel, which only permits one-way communications, and it directs

23  subscribers to "Unblur Chegg Answers," a related Telegram group. Nisos communicated with the

24  most active members of "Unblur Chegg Answers," and these communications revealed that

25  multiple people—all of whom appear to be based in India—are involved in running and monetizing

26  Homeworkify. *Id.* ¶¶ 13–15. The only time zone referenced in "Free Chegg Alert" and "Unblur

27  Chegg Answers" is India Standard Time. Hudson Decl. ¶13. Another active member of "Unblur

28  Chegg Answers" stated that "almost all paid Chegg bot channels are Indian." *Id.* ¶15.

As the Court previously noted, once there is sufficient evidence that a defendant is foreign, alternative service does not require a precise physical address.[5] (dkt. 40 at 7); *see Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1013, 1018–19 (9th Cir. 2002) (allowing the plaintiff to serve process by email on a Costa Rican entity with an unknown address); *Elsevier, Inc. v. Siew Yee Chew*, 287 F. Supp. 3d 374, 377, 380 (S.D.N.Y. 2018) (service by email on defendants that plaintiff learned were based out of China and Malaysia but whose location could not otherwise be determined); *Assef v. Does 1-10*, No. 15-CV-01960-MEJ, 2016 WL 1191683, at *3–4 (N.D. Cal. Mar. 28, 2016) (allowing alternative service under Rule 4(f)(3) in part because "plaintiffs have learned that Defendants are likely based in either Singapore or Australia").

Given this additional evidence demonstrating that Defendant Swami (who admitted to running Homeworkify) is based in India, and that other unknown Homeworkify actors also are based in India, Chegg renews its request to serve Defendants pursuant to Rule 4(f)(3). Specifically, Chegg asks for leave to serve Defendants through the email address Homeworkify provided when it registered Homeworkify[.]eu, and by serving Defendant Vikasa Swami through the email accounts and Telegram account listed in paragraph 48 of the Heasman Declaration.[6]

**B.   Chegg's Requested Relief is Warranted**

As the expanded factual record demonstrates, Defendants' conduct causes irreparable harm to Chegg, its current and prospective customers, and the general public. In addition to scraping Chegg.com during the summer of 2022 and exceeding Chegg's content limits, in breach of Chegg's Terms of Use (as the Court already has determined), Defendants and their co-conspirators accessed existing individual Chegg accounts without authorization. Defendants used credentials obtained

---

[5] India is a signatory to the Hague Convention, though it has not agreed to several key provisions of the Convention. See Status Table, HCCH, https://www.hcch.net/en/instruments/conventions/status-table/?cid=17 (last visited Aug. 15, 2023). Even if Defendants are located in a Hague Convention country, the Convention "does not apply where," as here, "the address of the person to be served with the document is not known." Hague Conv., Art. 1; see also *Future Motion, Inc. v. Doe*, No. 21-cv-03022-JSC, 2021 WL 3052594, at *2 (N.D. Cal. July 20, 2021) (permitting service by email and holding that Hague Convention "does not apply where the address of the person to be served with the document is not known." (internal quotations omitted)); *Goes Int'l, AB v. Dodur Ltd.*, No. 14–CV–5666 LB, 2015 WL 1743393, at *3 (N.D. Cal. Apr. 16, 2015) (same).

[6] Homeworkify provided the email address 8f47b7b0dd3f4d558b03d5e7ad9d127a .protect@withheldforprivacy.com when it registered.

Cooley LLP
Attorneys at Law
San Francisco

from other platforms to do this, changed the users' Chegg passwords, and then used the Chegg accounts to access Chegg's website without authorization to steal Chegg's proprietary and trademarked content ("Chegg Content"), which is now available on Homeworkify. Then, in retaliation for Chegg's efforts to take down Homeworkify's current domain, Defendants launched a cyberattack against Chegg.com, which briefly took down the site, and took significant resources to mitigate. Defendants have continued their activities even after having received an unambiguous demand from Chegg to cease those activities, and having any and all permission to access Chegg's products and site revoked. The evidence in support of the Renewed Motion consists of sworn declaration and forensic evidence demonstrating the connection between Defendants and the Chegg account takeovers and the cyberattack. The likelihood of success on the merits weighs heavily in favor of granting injunctive relief, and the new evidence demonstrates that the equities tip even more sharply in Chegg's favor.

### 1.    Chegg is likely to succeed on the merits of its CFAA claims.

After submitting the Motion, Chegg discovered evidence that Defendants misappropriated the login credentials of authorized Chegg accountholders and used those credentials to access Chegg accounts without authorization to copy and steal Chegg Content. This is a clear violation of the CFAA. Chegg also has discovered evidence that directly connects Defendants with the DDoS attack that took place in May 2023.[7]

#### a.    Defendants accessed individual Chegg accounts without authorization by taking over and using existing Chegg accounts to copy and steal Chegg Content.

In addition to the significant amounts of data stolen by wildly exceeding Chegg's content limits during the summer of 2022, Defendants used stolen account credentials to access Chegg's

---

[7] The Court previously found Chegg had not provided sufficient facts to show a likelihood of success on Chegg's CFAA claims because "the CFAA is best understood as an anti-intrusion statute and not a misappropriation statute" and that Chegg's evidence showed misuse not an unauthorized intrusion into a protected computer. (July 3 Order, dkt. 40 at 2-3). The Court also found that "Chegg only speculates that Homeworkify has continued to access Chegg content since it ordered Homeworkify to cease and desist in November; it does not provide any evidence that Homeworkify is in fact doing so." (*Id*. at 3). Finally, the court noted that "if Chegg can persuasively demonstrate that Homeworkify is behind the cyberattack Chegg.com recently experienced, that might change this conclusion." (*Id*. at n.4).

website without authorization and exfiltrate Chegg solutions. Under the CFAA, a party is subject to liability if it "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer." 18 U.S.C § 1030(a)(2). A "protected computer" is a computer "used in [or affecting] interstate or foreign commerce or communication." *Multiven, Inc. v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887, 891 (N.D. Cal. 2010). Any computer with an internet connection qualifies. *See United States v. Nosal*, 676 F.3d 854, 859 (9th Cir. 2012) ("*Nosal I*"). The phrase "'without authorization' is a non-technical term that, given its plain and ordinary meaning, means accessing a protected computer without permission." *United States v. Nosal,* 844 F.3d 1024 (9th Cir. 2016) ("*Nosal II*"). "[A] defendant can run afoul of the CFAA when he or she has no permission to access a computer or when such permission has been revoked explicitly." *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016). Congress enacted the CFAA in 1984 primarily to address the growing problem of computer hacking. *Nosal I*, 676 F.3d at 858. Courts have held that accessing a password-protected, members-only, area containing "content created by plaintiff 'for the benefit and enjoyment of its paying members'" without being such a paying member is a violation of the CFAA. *Millennium TGA, Inc. v. Leon*, No. 12-CV-01360 MKB, 2013 WL 5719079, at *7 (E.D.N.Y. Oct. 18, 2013). In *Millennium TGA*, the defendant gained access to the members-only section of the website by using "passwords that he hacked or stole from others." *Id* at *2. The court found that this was unauthorized access under the CFAA. *Id.*

The Ninth Circuit has made clear that a person violates the CFAA when he or she accesses a computer that requires unique login credentials (generally, username plus password) that belong to someone else. *Nosal II* involved a former employee who used current employees' login credentials to access company computers and collect confidential information. 844 F.3d at 1029. The Court held the former employee had acted "without authorization," in violation of the CFAA. *Id.* In *Power Ventures*, 844 F.3d at 1062-63, the Ninth Circuit found that the defendant (Power Ventures) had violated the CFAA by accessing Facebook accounts after Facebook had revoked the defendant's permission to access Facebook's computers via a cease-and-desist letter, in addition to blocking the defendant's known IP addresses. These essential holdings of *Nosal II* and *Power*

1   *Ventures* survive the Supreme Court's decision in *Van Buren v. United States,* 141 S. Ct. 1648

2   (2021), as they focus on *accessing* a protected computer, not the improper *use* of information

3   obtained post-access.[8] *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1199 (9th Cir. 2022)

4   ("*Nosal II* and *Power Ventures* control situations in which authorization generally is required and

5   has either never been given or has been revoked").

6       Chegg has uncovered evidence demonstrating that Defendants accessed the subscriber-only

7   portion of Chegg's website by using existing Chegg subscribers' credentials without authorization

8   in order to exfiltrate Chegg Content for Homeworkify. The original email addresses for these Chegg

9   accounts were involved in other sites' data breaches. Defendants and their co-conspirators used the

10  compromised credentials to log into Chegg accounts, then they changed the passwords and used

11  the accounts without the subscribers' or Chegg's permission to steal Chegg Content. Heasman

12  Decl., ¶¶ 31-40. This is precisely the sort of behavior the CFAA is meant to prohibit. Furthermore,

13  this behavior continued after Defendants received a cease-and-desist letter, and it continues to this

14  day. *Id.* ¶¶ 7-8,38-40.

15      For example, Chegg has identified with specificity two examples in which Defendants have

16  stolen Chegg Content by obtaining access to legitimate Chegg subscriber accounts without the

17  subscribers' or Chegg's authorization. *Id.* ¶¶ 35-40. These accounts were compromised due to data

18  breaches on other platforms, which revealed the legitimate subscribers' passwords that they

19  apparently had reused on Chegg.com. *Id* ¶ 34. Using the compromised credentials, Defendants

20  changed the legitimate users' passwords, locking them out of their Chegg accounts, and then used

21  the accounts to copy and steal Chegg Content. *Id* ¶¶ 31-40. This activity continued after Defendants

22  received the cease-and-desist letter on November 15, 2022. *Id* ¶¶ 7, 8, 38-40.

23      The process of identifying an account takeover and attributing it to Homeworkify takes

24  several steps. Heasman Decl. ¶¶31-40. Because of the massive amount of Chegg Content on

---

[8] *Van Buren* draws a distinction between computer users who "can or cannot access a computer system," and, suggests a baseline in which there are "limitations on access" that prevent some users from accessing the system (i.e., a "gate" exists, and can be either up or down). *hiQ Labs, Inc. v. LinkedIn Corp*., 31 F.4th 1180, 1199 (9th Cir. 2022) Under the Court's "gates-up-or-down inquiry" if authorization is required and has been given, the gates are up; if authorization is required and has not been given, the gates are down. *Id*. Here, Chegg Content is not hosted on a publicly available webpage, and Chegg revoked Defendants' access to its site.  Chegg's gates were down.

**MOTION FOR PRELIMINARY INJUNCTION**
**3:22-cv-07326-CRB**

Chegg.com, some Chegg Content may have only been viewed by a single Chegg user. *Id* ¶ 32. Some Chegg solutions are created in unique formats or are handwritten. *Id.* These easily identifiable and unique pieces of Chegg Content, if found on Homeworkify, can be tied to the specific Chegg accounts Defendants used to access and steal the content. *Id.* If the Chegg Content has only been viewed one time, and then that exact content appears on Homeworkify, this conclusively identifies the Chegg accounts Defendants used to obtain the specific piece of single-view Chegg Content. *Id.*

Through an extensive manual process, Chegg recently discovered two separate instances where specific Chegg Content had only been viewed by one Chegg account, and then the viewed Chegg Content became available Homeworkify. Heasman Decl. ¶ 33. This enabled Chegg to identify two Chegg accounts that had been used to obtain Chegg Content for Homeworkify. *Id.* Both accounts had been taken over from legitimate Chegg users by malicious actors who: (i) obtained login credentials from other companies' data breaches; (ii) changed the passwords and recovery email addresses for the accounts; (iii) used the compromised accounts to copy and exfiltrate Chegg Content. *Id.*

Chegg's investigation revealed that Defendants obtained unauthorized access to multiple Chegg accounts in this manner, as shown by the following specific examples:

**User "MB"**

Exhibit G to the Supplemental Heasman Declaration is a screen capture of a handwritten Chegg solution that is currently available on Homeworkify. Heasman Decl. ¶35. The solution in Exhibit G has only been viewed by a single Chegg account ("MB Chegg Account"). *Id.* No other Chegg user viewed this solution, so the only possible way Homeworkify could have obtained this step-by-step solution was by using the MB Chegg Account. *Id.*

Chegg's records reveal that MB Chegg Account was accessed without authorization on May 2, 2021, when both the email address and password for the MB Chegg Account were changed, and a new device was added to the account. *Id.* ¶ 36. Later that same day, the email address and password were changed back to the original email address and password, most likely to avoid detection. *Id.* The original email address for this account appeared in another company's data

breach.[9] *Id.* ¶31

During the time the MB Chegg Account was accessed without authorization, the account viewed the Chegg solution in Exhibit G. *Id.* ¶ 37. That same Chegg solution is now available on Homeworkify. Heasman Decl. ¶¶ 33-37. This demonstrates that content available on Homeworkify was obtained by individuals who accessed Chegg's website without authorization for the purpose of obtaining information, in violation of the CFAA.

**User WS**

The MB Chegg Account is not the only example of Defendants' unauthorized access. Exhibit H to the Heasman declaration is a screen capture of a Chegg solution that was first published on Chegg on December 8, 2022, *after Defendants received the cease-and-desist letter. Id.* ¶38. The same solution is available on Homeworkify. *Id.* ¶33. The solution in Exhibit H has only been viewed by a single Chegg account ("WS Chegg Account"). *Id.* ¶38. No other Chegg user has viewed this solution, so the only possible way Homeworkify could have obtained the step-by-step solution was by using the WS Chegg Account. *Id.*

Chegg's records reveal that the WS Chegg Account was accessed without authorization on February 28, 2021, when the email address and password were changed. Heasman Decl. ¶ 39. On April 11, 2023, the WS Chegg Account viewed the Chegg solution in Exhibit H. *Id.* ¶ 40. Like the MB Chegg Account, the email associated with the WS Chegg Account had previously been stolen in another data breach.[10] *Id.* ¶ 33

* * *

These two examples establish that Chegg is likely to succeed on its CFAA claims. Defendants and/or their co-conspirators accessed at least two Chegg accounts without Chegg's or the legitimate subscribers' authorization, used the hacked accounts to obtain Chegg's proprietary step-by-step solutions, and then made the solutions available on Homeworkify.

---

[9] Chegg was able to determine this email address was involved in another platform's data breach by searching the email on the website "HaveIbeenpwned.com" which tracks whether an email address has ever been involved in a data breach and provides the source of those data breaches.

[10] Chegg was able to determine this email address was involved in another platform's data through "HaveIbeenpwned.com" which indicated this user's email address was involved in 8 separate data breaches.

**b.   The Evidence Chegg has developed shows that a DDoS attack in violation of 18 U.S.C. § 1030(a)(5)(A) was perpetrated by Defendants.**

Defendants separately violated the CFAA by launching a DDoS attack against Chegg.com on June 24, 2023. Cyberattacks violate the CFAA. *Integrated Waste Sols., Inc. v. Goverdhanam*, No. CIV.A. 10-2155, 2010 WL 4910176, at *8 (E.D. Pa. Nov. 30, 2010) ("such facts sufficiently allege the existence of a protected computer system used in interstate commerce. Similarly, Plaintiff's allegations of Defendants' 'cyber-attacks,' taken as true, are clearly unauthorized. Thus, Plaintiff has fulfilled the first two prongs of the CFAA."). Multiple courts have specifically held that a distributed denial-of-service ("DDoS") attack, a type of cyberattack, violates the CFAA *See Ubisoft, Inc. v. Kruk*, No. CV 20-478-DMG (ASX), 2021 WL 3472833, at *4 (C.D. Cal. July 9, 2021) ("[Plaintiff] sufficiently states a claim under 18 U.S.C. section 1030(a)(5)(A) by alleging that Defendants and their customers intentionally launch DDoS attacks on [Plaintiff's] Servers"); *Svanaco, Inc. v. Brand*, 417 F. Supp. 3d 1042, 1059 (N.D. Ill. 2019) (undisputed that "DDoS attacks violated the CFAA"); *BHRAC, LLC v. Regency Car Rentals, LLC*, No. CV 15-865-GHK MANX, 2015 WL 3561671, at *4 (C.D. Cal. June 4, 2015) ("Defendants interfered with the operation of its website by pointing traffic to the company's image server, which overwhelmed its capacity and caused it to go down…Essentially, that is a rudimentary type of denial of service attack.").

On June 24, 2023, Defendants launched a DDoS attack against Chegg in retaliation for Chegg's efforts to keep Homeworkify from using stolen Chegg Content. A DDoS attack is a cyberattack where cybercriminals flood a computer network with so much malicious Internet traffic that the network cannot operate or communicate as it normally would. Heasman Decl. ¶ 42. DDoS attacks are effective because they utilize multiple (often compromised) computer systems (such as computers and other networked resources) as sources of attack traffic. *Id.* The DDoS attack caused a partial outage on Chegg.com that lasted approximately two minutes and also impacted customer orders. *Id.* Chegg had to allocate significant internal and external resources to mitigate and block the DDoS attack. *Id.* Multiple Chegg teams worked around the clock to fight off successive waves of these malicious attacks, which continued through July 2, 2023. *Id.*

Chegg has convincing evidence that Defendants launched this DDoS attack. First, the attack

occurred on June 24, 2023, the day after Chegg sent a letter to the European hosting provider of Homeworkify.net and Homeworkify.eu, asking the provider to take down Homeworkify's domain. Heasman Decl. ¶43. A hosting provider will typically immediately notify the email address attached to the domain that is the subject of the take-down request. *Id.*

Second, two of the IP addresses used in the DDoS attack are connected to Homeworkify, and one is connected to Defendant Swami specifically. *Id.* ¶44. Chegg has records of each IP address from which the DDoS attack emanated. *Id.* The DDoS attack used the IP address 23.128.248.30, the same IP address used for the vast majority of the automated scraping of Chegg.com during the summer of 2022. *Id.* The DDoS attack also used the IP address 192.42.116.184, the same IP address @theviikash used on June 21, 2023 to access the hyperlink from Nisos. *Id.* at ¶44.

### 2.   Chegg is likely to succeed on its Section 502 claim.

California's CFAA counterpart, the Comprehensive Computer Data Access and Fraud Act, imposes liability on a person who "[k]nowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network." Cal. Penal Code § 502(c)(2). Because the "necessary elements of a Section 502 claim do not differ materially from the necessary elements of the CFAA claim," when a Section 502 claim is based on the same facts as the CFAA claim, the analysis of whether there has been a violation is identical. *Multiven, Inc.*, 725 F. Supp. 2d 895. Accordingly, Defendants' conduct violates Section 502 for the same reasons it violates the CFAA.

### 3.   Chegg is likely to succeed on the merits of its new UCL 17200 claim.

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200; *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1554 (2007). "The UCL 'borrow[s] violations of other laws and treats' them as unlawful business practices 'independently actionable under section 17200.'" *Oas v. Rama Cap. Partners, LLC*, No. 820-CV-01634-(MCS/ADS), 2020 WL 7786546, at *7 (C.D. Cal. Nov. 18, 2020) (quoting *Farmers Ins. Exch. v. Superior Ct.*, 2 Cal. 4th 377, 383 (1992) (quotations omitted)). The remedies available

under the UCL are contained in Section 17203 and are "generally limited to injunctive relief and restitution." *Korea Supply Co. v. Lockheed Martin Co.*, 29 Cal.4th 1134, 1144 (2003). "Damages are not available under section 17203." *Cortez v. Purolator Air Filtration Products Co.*, 23 Cal. 4th 163, 173 (2000).

Defendants have violated numerous laws and are liable for these unfair business practices under California law. As set forth above, Defendants have violated the CFAA and the Comprehensive Computer Data Access and Fraud Act. The Court previously found that Chegg is likely to succeed on its Lanham Act and contract claims. Violations of federal and state statutes, and state common law, if tied to a business practice, subject Defendants to liability under the UCL. *Cf. Sw. Marine, Inc. v. Triple A Mach. Shop, Inc.*, 720 F. Supp. 805, 808 (N.D. Cal. 1989) (UCL claim predicated on violation of federal statute); *Quelimane Co. v. Stewart Title Guar. Co.,* 19 Cal. 4th 26, at 42-43 (1998), *as modified* (Sept, 1998) (UCL claim predicated on California statute); *AmeriPOD LLC v. DavisREED Constr. Inc.*, No. 17-cv-00747, 2017 WL 2959351, at *6-7 (S.D. Cal. July 11, 2017) (holding intentional interference with contract can form the basis of a UCL claim).

Chegg is likely to prevail on its UCL claim.

**C.    Chegg Will Suffer Irreparable Harm Because the Damages It is Suffering are Immeasurable and Will Not End With the Imposition of an Uncollectable Money Judgment**

Imagine a brick-and-mortar professional library that contains unique textbooks that are not available at any other library. To continue to operate, the library charges a monthly membership fee to students who wish to review the texts. The library uses the membership fee to obtain more texts so that more students from more disciplines can use the library. Occurring in a computer environment, this is the part of Chegg's business at issue in this case.

Now imagine that someone steals millions of those texts and makes copies of them. Using those copied texts, the person opens another library right next to the original library. But this library does not charge a fee; it allows students to view the illicitly obtained copies of the texts for free. When students ask the internet "where can I find these texts?", the internet directs them to *both* libraries. Over time, more and more students decide to look at the texts for free in the stolen library

rather than paying to review them in the library that paid to obtain them in the first instance. This is what Homeworkify has done and continues to do.

Chegg is suffering irreparable harm. The harm is not readily measurable and derives, primarily, from the ongoing and increasing loss of its current and future customers to the illegally operating "business" that has stolen Chegg's product and is offering it for free to the same users who would otherwise sign up and pay for Chegg's service. Measuring the precise loss is not possible because Chegg cannot know exactly how many people are choosing the Homeworkify site over the Chegg.com. It is clear, however, that every day Homeworkify continues to operate, Chegg loses more customers, and both its brand and its customer base are continually and irreparably degraded.  As the "overlap" data provided in the Huang Declaration shows, increasing numbers of students are turning from Chegg to Homeworkify. Huang Decl. ¶ 9. Moreover, even if a money judgment could be calculated, it vanishingly unlikely that it would ever be collected.  The only identified defendant, Vikasa Swami, is a student who lives in India.  Chegg has not uncovered any evidence that he has any assets, let alone those sufficient to compensate Chegg for the ongoing loss of its subscribers. Heasman Decl. ¶ 10.

This back-to-school period is a particularly important time of the year for Chegg, which is why Chegg has returned to this Court seeking urgent injunctive relief. The harm Chegg is suffering will be magnified substantially if Homeworkify is allowed to remain live as Chegg enters its most critical period—when, historically, Chegg obtains a large percentage of new subscribers.

### 1. Homeworkify has continued to access Chegg's website through account takeovers, even after receiving the Cease-and-Desist letter.

As set forth above, Chegg uncovered two specific examples of Defendants' unauthorized account takeovers, one of which occurred *after* Defendants Chegg issued a cease-and-desist letter on November 15, 2022. Given the extensive manual investigation required to identify these two examples, Defendants likely continue to use unauthorized account takeovers to obtain Chegg step-by-step solutions. Heasman Decl. ¶ 33.[11]

---

[11] While Chegg has robust processes in place to detect and prevent such account takeovers, including multifactor authentication, it is impossible to altogether prevent every account takeover involving stolen credentials. *Id.*

Chegg is suffering irreparable injury as a result of the continuing campaign of taking over Chegg user accounts and stealing Chegg content to post on Homeworkify. Section 502(e)(1) expressly empowers plaintiffs to obtain injunctive relief against a defendant who violates Section 502. *Facebook, Inc. v. Grunin*, 77 F. Supp. 3d 965, 973 (N.D. Cal. 2015). Courts in this District have previously granted injunctive relief upon a showing that a defendant continued to obtain access in an unauthorized manner regardless of plaintiff's attempts to halt the access. *Facebook, Inc. v. Sluchevsky*, No. 19-CV-01277-JSC, 2020 WL 5823277 (N.D. Cal. Aug. 28, 2020), *report and recommendation adopted*, No. 19-CV-01277-YGR, 2020 WL 5816578 (N.D. Cal. Sept. 30, 2020) (finding irreparable harm where plaintiff argued that it was very likely that defendant would continue to access plaintiff's platform without authorization); *Tagged, Inc. v. Does 1 through 10*, No. C 09-01713 WHA, 2010 WL 370331, at *12 (N.D. Cal. Jan. 25, 2010) (Granting a permanent injunction where Defendant failed "appear in this action or respond to the allegations in the complaint give no indication that he would stop his spamming activities… plaintiff sufficiently has demonstrated a reasonable likelihood of defendant's future violations").

Defendants, by using illegal account takeover tactics, have the tools to continue their unauthorized access, and have shown that they continue to use them even after receiving a cease-and-desist letter. Chegg has done everything it can to prevent such access, but it needs an injunction to remove the *incentive* for this unauthorized access—the websites Defendants are using to monetize stolen Chegg Content. The requested injunctive relief would order the domestic ISPs, and request the foreign ISPs, that host Homeworkify and all Redirect Sites, as defined in the Amended Complaint, to transfer the domains to Chegg. This will both prevent Defendants from being able to access the sites, and it will provide Chegg the opportunity to analyze the sites' traffic and identify the vectors from which the stolen property is being directed to the websites.

## 2. Homeworkify is interfering with Chegg's property rights on an ongoing basis, and Chegg is losing customers in increasing numbers.

As a result of the theft and ongoing conversion of Chegg's content, Chegg is losing an increasing number of customers to Homeworkify. Both the interference with Chegg's property rights and the loss of prospective customers constitute irreparable harm.  Case law in this circuit is

squarely on point.

The "Ninth Circuit has recognized, **separately from cases dealing with the potential demise of a business**, that '[e]vidence of **threatened loss of prospective customers** or goodwill certainly **supports a finding of the possibility of irreparable harm**.'" *Facebook, Inc. v. BrandTotal Ltd.*, 499 F. Supp. 3d 720, 736 (N.D. Cal. 2020) (emphasis added) (*quoting Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001)). "[I]ntangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm." *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). A district court does not abuse its discretion in finding irreparable harm where damages from such injuries "would be difficult to valuate." *Id.* The possibility of losing an unknown group of customers can constitute irreparable harm. *Stuhlbarg Intern. Sales Co.*, 240 F.3d at 841("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm.").

The Ninth Circuit held that distributing another party's proprietary content can constitute irreparable harm. In *Disney Enterprises, Inc. v. VidAngel*, *Inc*, VidAngel operated an online streaming service that removed objectionable content from movies and television shows and then streamed to its customers a filtered version of the work, which VidAngel typically acquired by purchasing physical discs containing copyrighted movies and television shows. 869 F.3d 848, 852 (9th Cir. 2017). Often VidAngel would stream the content before the studio licensed that content to streaming services and while the content was only available on physical discs. *Id.* The district court granted a preliminary injunction suspending VidAngel's operations, and the Ninth Circuit confirmed there was substantial evidence of irreparable harm because "VidAngel's service undermines the value of the Studios' copyrighted works, their 'windowing' business model, and their goodwill and negotiating leverage with licensees." *Id.* at 866.

Chegg faces the exact risks the courts have recognized as irreparable harm: the loss of an unknown pool of potential customers and the theft of its property. Almost 10 million pieces of Chegg Content have been stolen by Homeworkify, and Homeworkify continues to make that content available to users via its websites. Transferring control of Homeworkify's website to Chegg

1    would allow Chegg to stop the ongoing harm. There is no other sufficient remedy.

2           Absent injunctive relief, the Chegg will continue to lose customers to Homeworkify, at a

3    critical time of year. The start of the school year represents the biggest increase in subscribers for

4    Chegg by far, representing nearly 30% of Chegg's total subscriptions for the entire year. Huang

5    Decl. ¶ 3. Evaluating the precise number of subscribers Chegg has lost due to Defendants conduct

6    is not possible; nor can Chegg determine the precise financial impact of the loss of these potential

7    subscribers. *Id* at ¶ 6. Using a product called "similar web," which tracks the number of times a

8    user accesses the Chegg.com and then immediately accesses Homeworkify, Chegg can estimate

9    the number of unique users who copy a URL from Chegg.com and then paste it into Homeworkify.

10   *Id* at ¶ 7. The amount of this "overlap" traffic between Chegg and Homeworkify has increased

11   sharply over time. In February 2022, Chegg observed virtually no overlap of traffic. *Id* at ¶ 9. By

12   August 2022, the shared audience had increased to 68.9%, then to 79.5% in October 2022, and to

13   80.7% in April of 2023. *Id.* This massive increase in "overlap" traffic demonstrates irreparable

14   injury—Chegg customers are increasingly turning to Homeworkify to obtain Chegg content for

15   free. Chegg estimates that it has lost at least 150,000 subscribers to Homeworkify for the year 2023

16   alone. *Id.* ¶ 10. As long Chegg Content is available on Homeworkify, Chegg will lose potential

17   subscribers who will forgo paying for Chegg Content in favor of obtaining that content for free on

18   Homeworkify.  *Id*  at ¶ 4. This is precisely the sort of prospective customer loss that constitutes

19   irreparable harm.

20          Even if damages were calculable, Chegg will never be made whole for the theft of a large

21   percentage of its content library. Homeworkify is run by a person who identifies himself a student

22   and lives in Rajasthan, India. Chegg has not uncovered any evidence that Defendant Swami has the

23   assets to compensate Chegg for the ongoing loss of its subscribers. Heasman Decl. ¶10. Nor is there

24   a reasonable possibility that Chegg will ever recover monetary damages from resident of India with

25   no identified assets within the reach of U.S. Courts. A monetary loss can qualify as irreparable

26   harm when a plaintiff brings an action against a judgment-proof defendant. For example, in

27   *Lakeview Tech., Inc. v. Robinson*, 446 F.3d 655 (7th Cir. 2006), the Court of appeals held that an

28   employee who left a company for a competitor could be enjoined from divulging trade secrets—

despite the fact that damages could be calculated—because there were no assurances that the plaintiff could collect the judgment. *Id.* at 657-58. Nothing in the record indicated that the departing employee "would be good for 'very large' damages." *Id.* at 657. A bond posted by the defendant might have altered the analysis, but none was posted, and the court of appeals ordered preliminary injunctive relief. *Id.* at 658. *See also Hanover Am. Ins. Co. v. Tattooed Millionaire Ent., Inc.*, No. 2:16-CV-2817-JPM-TMP, 2017 WL 354266, at *10 (W.D. Tenn. Jan. 24, 2017) (holding that the Defendant was unlikely to have sufficient assets to pay damages and that Plaintiff would suffer irreparable harm in the absence of injunctive relief).

### D.   Chegg Seeks the Only Available Remedy That Will Stop the Illegal Use of Its Content

Homeworkify uses and has used domains and web servers hosted by third-party ISPs to copy, exfiltrate, and make available online more than ten million pieces of Chegg's proprietary and trademarked content.  *See* Amended Compl. ¶¶1, 8. Chegg's proposed order, if entered by the Court, would direct these third-party registrars, web infrastructure companies, and web hosting providers to take down or suspend the infrastructure used by the Homeworkify, and transfer the domains to Chegg, thus disrupting Defendants' ability to steal more Chegg content. In the alternative, Chegg seeks an order that would shut down these domains and prevent Homeworkify from continue to operate.

The All Writs Act provides that courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. §1651. Under well-established precedent, this language empowers courts to issue orders to nonparties. The power conferred by the Act extends, in "appropriate circumstances," to "persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice." *Makekau v. State*, 943 F.3d 1200, 1205 (9th Cir. 2019). Notably, such jurisdiction may "encompass even those who have not taken any affirmative action to hinder justice." *Sprint Spectrum L.P. v. Mills*, 283 F.3d 404, 413-414 (2d Cir. 2002) (cleaned up). This "grant of authority to enjoin and bind non-parties to an action when needed to preserve the court's ability to . . . enforce its decision," is "[a]n important feature

of the All Writs Act." *In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*, 770 F.2d 328, 338 (2d Cir. 1985).

To determine whether the writ requested is "necessary or appropriate" within the meaning of the Act, courts must consider: (1) whether the writ "unreasonabl[y] burdens" the third party at issue; (2) whether the writ is "necessary" or "essential to the fulfillment of the purpose" of a court order; and (3) whether the third party is "so far removed from the underlying controversy that its assistance could not be permissibly compelled." *United States v. New York Tel. Co.*, 434 U.S. 159, 172- 78 (1977); *see also United Spinal Ass'n v. Bd. of Elections in City of New York*, No. 10CIV5653DABHBP, 2017 WL 8683672, at *5 (S.D.N.Y. Oct. 11, 2017), *report and recommendation adopted*, No. 10-CV-5653 (DAB), 2018 WL 1582231 (S.D.N.Y. Mar. 27, 2018) (same).

The narrowly tailored relief requested by Chegg satisfies these requirements. First, requiring these US-based companies to suspend or take down the relevant infrastructure imposes minimal burdens. In *New York Telephone*, the Supreme Court noted that the telephone company "regularly employs [pen register] devices without court order" for its own business purposes.  434 U.S. at 174. Here, likewise, domain registrars and web infrastructure companies routinely suspend or terminate domain services in the ordinary course of business. The same is true for the hosting companies that maintain the servers. Second, the writ requested is necessary to effectuate the proposed order, the purpose of which is to disrupt Homeworkify's operations. Just as the surveillance authorized in *New York Telephone* could not have been accomplished without the participation of the telephone company, the reasonable cooperation of the third-party registrars is required to deny Homeworkify the means to employ illegal tactics. *See Application of U.S. of Am. for an Ord. Authorizing an In-Progress Trace of Wire Commc'ns Over Tel. Facilities*, 616 F.2d 1122, 1129 (9th Cir. 1980).  Lastly, the third parties used for this infrastructure are not "so far removed" from the underlying criminal activity that their assistance cannot reasonably be compelled. *See New York Tel.*, 434 U.S. at 174. They control the very domains and servers that allow Homeworkify to operate.

In keeping with these principles, district courts across the country have repeatedly invoked

1    the All Writs Act to grant relief similar to the relief requested here. *E.g.*, *Microsoft Corp. v. John*

2    *Does 1–82*, No. 3:13-CV-00319-GCM, 2013 WL 6119242, at *3 (W.D.N.C. Nov. 21, 2013) (noting

3    that the defendants had "engaged in illegal activity using the Internet domains" and ordering that

4    the specified domains be "immediately transferred to the ownership and control of Microsoft");

5    *Microsoft Corp. v. Does 1-18*, No. 1:13CV139 LMB/TCB, 2014 WL 1338677, at *12–13 (E.D.

6    Va. Apr. 2, 2014) (ordering registrars of domains associated with a botnet to "transfer the domains

7    . . . to the control of Microsoft"); *Microsoft Corp. v. Does 1–51*, No. 1:17-CV-4566, 2017 WL

8    10087886, at *4 (N.D. Ga. Nov. 17, 2017) (ordering registrars to "tak[e] other reasonable steps to

9    work with Microsoft to ensure the redirection of the domains and to ensure that Defendants cannot

10   use them to control the botnets"); *Microsoft Corp. v. Does 1–2*, No. 20-CV-1217LDHRER, 2021

11   WL 4260665, at *4 (E.D.N.Y. Sept. 20, 2021) (ordering domain registrars to "take reasonable steps

12   to . . . prevent the domains from being controlled by the Defendants"). To protect Chegg from the

13   serious threat posed by Homeworkify, it is well within this Court's authority to order the takedown

14   of the domains and servers specified in Appendix A to the Proposed Order Granting Chegg's

15   Motion for a Preliminary Injunction.

16   **IV.    CONCLUSION**

17       For all the foregoing reasons, Chegg respectfully requests that the Court enter the

18   preliminary injunction enjoining Defendants from (1) accessing Chegg's website without

19   authorization, (2) downloading, scraping, using, or disseminating Chegg Content, (3) operating the

20   Homeworkify and/or the Redirect Sites, and (4) using and infringing Chegg's trademarks.  Chegg

21   further requests that the Court enter the preliminary injunction, and with respect to the

22   Homeworkify and Redirect Site domains, issue an order requesting the transfer of the domains to

23   Chegg or shut down of the domains, and order that the means of notice of the preliminary injunction

24

25

26

27

28

hearing and service of the Complaint set forth herein meet Fed. R. Civ. P. 4(f)(3), satisfy due process, and are reasonably calculated to notify Defendant of this action.  A proposed order will be lodged with this motion.

Dated: August 16, 2023                                COOLEY LLP


                                                      By: /s/ *John Hemann*
                                                          John Hemann

                                                      Attorneys for Plaintiff
                                                      CHEGG, INC.

290031864 v1

Cooley LLP
Attorneys at Law
San Francisco